St. Elmo **FERRARA**, Trustee of an Express Trust

v.

**PHILADELPHIA LABORATORIES, INC.**, Proctor Hospital, Dr. Edward R. Bove, Dr. William A. O'Rourke, Jr. and Dr. Henry J. Fregosi.

Civ. A. Nos. 4753, 4754.

United States District Court D. Vermont.

Aug. 10, 1967.

Robert A. Bloomer, Bloomer & Bloomer, Rutland, Vt., for plaintiff.

Frederic W. Allen, Wick, Dinse & Allen, Burlington, Vt., for defendant Philadelphia Laboratories, Inc.

Peter P. Plante, Black & Plante, White River Junction, Vt., for defendant Proctor Hospital.

Christopher A. Webber, Webber & Costello, Rutland, Vt., for defendant Dr. Edward R. Bove.

Richard E. Davis, Davis, Martin & Free, Barre, Vt., for defendant Dr. William A. O'Rourke, Jr.

Albert W. Coffrin, Coffrin & Pierson, Burlington, Vt., for defendant Dr. Henry J. Fregosi.

## OPINION

LEDDY, District Judge.

These are two civil actions to recover against a drug manufacturer, a hospital and three physicians for personal injuries and other damages resulting from negligence and breach of warranties. The complaints in these actions both alleged, in substance, the following events:

On December 30, 1963, Gene Isabelle was admitted to the Proctor Hospital at Proctor, Vermont, for the delivery of her third child, born the following day. During the course of her labor, Mrs. Isabelle's attending physician, the defendant Dr. Edward R. Bove, administered to her a spinal or "saddle block" anesthetic, injecting a drug known as Lucaine, manufactured by the defendant Philadelphia Laboratories, Inc. and distributed in Vermont and other states. As a result, Mrs. Isabelle suffered serious physical and psychological injuries, including permanent paralysis from the waist down. During her first hospitalization, the defendant Dr. Henry J. Fregosi, an anesthesiologist on the staff of the Proctor Hospital, was consulted by Dr. Bove. Later Mrs. Isabelle was readmitted to the Rutland Hospital as a post partum patient with neurological complications, and there Dr. Bove consulted the defendant Dr. William A. O'Rourke, an internist.

Liability against Philadelphia Laboratories, Inc., is premised on breach of warranties and on the violation of certain federal drug statutes and regulations of the Food and Drug Administration. Proctor Hospital is alleged to have been negligent in furnishing improper care. Doctors Bove, O'Rourke and Fregosi are alleged to have failed to exercise care and diligence in keeping with sound medical practice while treating Mrs. Isabelle.

These actions are brought in the United States District Court for the District of Vermont to recover damages for the personal injuries suffered by Mrs. Isabelle, and other incidental damages suffered by her and her husband, Albert. But they are not brought by the Isabelles, both of whom are citizens of Vermont, as are all the defendants save Philadelphia Laboratories, Inc., a Pennsylvania corporation doing business at all times material in Vermont. The plaintiff in both actions is St. Elmo Ferrara, a New Jersey citizen characterized in the captions of these actions as the "trustee of an express trust."

Both actions were filed on December 27, 1966. The complaints allege that on December 26, 1966, the Isabelles, "by written instrument, assigned, transferred, conveyed, set over and delivered" to Ferrara all their "right, title and interest in and to any claims, demands, suits or actions for damages" suffered by them on or after December 30, 1963. Since both actions are identical in all respects material to this decision, they shall hereafter be referred to as one case in this opinion, which shall apply to both.

■ Each defendant urges dismissal of the action for lack of jurisdiction over the subject matter on the ground that the plaintiff has been improperly or collusively made a party to invoke the jurisdiction of this Court in violation of 28 U.S.C. § 1359. That section provides as follows:

"A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

Hearings before the Court on this and other defenses [1] were held, at which the plaintiff and the defendants introduced evidence in support of their positions. From the evidence bearing on the issue raised under section 1359, the following facts appear:

The history of this case begins on December 31, 1963, the date on which Mrs. Isabelle allegedly suffered the injuries recited in the complaint. Shortly thereafter, Mr. Isabelle retained the law firm of Bloomer and Bloomer to represent him and his wife in their efforts to obtain a recovery from those thought to be responsible, and since then that firm has continued to represent them.

The plaintiff, a New Jersey attorney, apparently first became connected with the matter in the spring of 1965, when he discussed the case with Attorney Robert Bloomer at the latter's request in New York City. The plaintiff's first meeting with Albert Isabelle was in October, 1966, in Mr. Bloomer's office in Rutland, Vermont. The following day he had a two-hour conversation with Mrs. Isabelle in Burlington, Vermont, where she was hospitalized for treatment and therapy. It does not appear that the plaintiff was acquainted in any way with the Isabelles prior to these meetings. Since then, he has seen them only once, visiting them at their home in Rutland on or about December 7, 1966, with Attorney Bloomer.

Mr. Ferrara told the Isabelles that at one time he was associated with another attorney representing a client suffering from the same or similar conditions as Mrs. Isabelle. He related his handling of the case, the therapy his client received and the improvement she subsequently made. He suggested that by reason of that experience he might be of assistance to the Isabelles. He also informed them of a physical therapy institution in New Jersey with which he had become acquainted during that case and, upon his return to New Jersey from one of his visits to Vermont, he sent a brochure describing that institution to Mr. Bloomer. At the December 7th meeting, Mr. Ferrara and Mr. Bloomer first discussed with the Isabelles the possibility that the Isabelles' claims against the defendants might be assigned in trust to Ferrara.

On November 17, 1966, prior to the last meeting with Ferrara, Albert Isabelle commenced an action in United States District Court for the District of Vermont, civil action number 4725, against Philadelphia Laboratories, Inc., one of the defendants here, based on substantially the same allegations as appear in this action. He is represented in that suit by the firm of Bloomer and Bloomer.

By writs dated December 15, 1966, Albert and Gene Isabelle each brought separate actions in Rutland County Court, Rutland, Vermont, against Philadelphia Laboratories, Inc., Proctor Hos-

---

1. In light of my conclusion that this Court is without jurisdiction by reason of 28 U.S.C. § 1359, it is unnecessary to pass on the additional defenses raised by each defendant. Because of its apparent relationship to the question of jurisdiction, however, one matter is deserving of brief comment. The defendants contend that the plaintiff is not the "real party in interest" under Rule 17, Fed.Rules Civ.Proc. On the other hand, the plaintiff relies on his contention that he is the "real party in interest" within that Rule to support his claim of jurisdiction. It is true that several cases may be found discussing jurisdiction under section 1359 in terms of whether or not the nominal plaintiff is the "real party in interest." Rule 17, however, is a rule of procedure, and "a rule of procedure, of course, however convenient and salutary it may be, is without efficacy to extend the jurisdiction of a court." Dery v. Wyer, 265 F.2d 804, 808 (2d Cir. 1959). "It is elementary that the jurisdiction of the federal court is neither enlarged nor restricted by [Rule 17] * * *." Rock Drilling, Blasting, etc. v. Mason & Hanger Co., 217 F.2d 687, 693 (2d Cir. 1954). In short, Rule 17 is subject to the requirements of section 1359, and a case brought by the "real party in interest" under that Rule may nevertheless be dismissed as collusive. See Birkins v. Seaboard Service, 96 F.Supp. 245 (D.N.J.1950); 3 Moore, Federal Practice (2d Ed.), pp. 1311, 1320; Note, 73 Yale L.J. 873 (1964).

pital, Dr. Edward R. Bove and Dr. William A. O'Rourke, Jr., all defendants here. Those suits, docket numbers 21937 and 21938, were both entered in the county court on December 21, 1966. Further, by writs dated December 19, 1966, Mr. and Mrs. Isabelle each brought separate suits in Rutland County Court against Dr. Henry J. Fregosi, also a defendant here. Those actions, docket numbers 21942 and 21943, were entered in that court on December 24, 1966. Each of the county court suits assert causes of action arising out of the same events as those upon which the action before this Court is based, and in each the plaintiff is represented by Bloomer and Bloomer.

All of the above suits are now pending and were at the time of execution of the trust instruments upon which the present case is based.

On December 9, 1966, a trust agreement, prepared by Mr. Bloomer and having substantially the same terms and provisions as the instruments upon which this action is premised, was executed by Mrs. Isabelle and Ferrara. Sometime between that date and December 22, 1966, this agreement was revoked by mutual consent of the parties to it, since it was decided during that interval that Mr. and Mrs. Isabelle should each execute such an agreement.

The trust agreements relied upon by the plaintiff here were prepared by Attorney Bloomer, forwarded to the plaintiff in New Jersey for his signature on December 22, and then returned to Mr. Bloomer in Vermont, where they were signed by the Isabelles on December 26. This suit was filed in federal court on the following day. This, the plaintiff testified, was "purely coincidental." Ferrara, the trustee and plaintiff here, is also represented by Bloomer and Bloomer.

With certain minor and immaterial exceptions, both trust instruments of December 26 are identical. Each purports to "assign, transfer, convey, set over and deliver * * * in trust" to the plaintiff all the "right, title and interest in and to any and all claims, demands, suits or actions" that each of the Isabelles may have "for damages, expenses, personal injuries, conscious pain and suffering, disability, losses, costs and any and all other damage suffered * * * on or after December 30, 1963," against the defendants, and against whom the plaintiff, as trustee, is directed by the terms of the agreements promptly to commence suit. Each instrument provides that the trustee is to receive a reasonable compensation not to exceed six hundred dollars per year for his services as trustee, and that he is to be reimbursed for expenses incurred in connection with the prosecution of the settlors' claims and the management of the trust. There is no provision that the trustee's compensation is in any way contingent upon a recovery or its amount. Each trust is to endure from its date until January 1, 1971, but power of revocation at any time after January 1, 1969, is expressly reserved to the settlor in each case.

The capacity in which Ferrara is acting is not entirely clear to the Court. His testimony at the hearings was vague, uncertain and often inconsistent or contradictory. His relationship to the Isabelles is particularly in doubt. While it appears that he did discuss with them the circumstances giving rise to their claims and the possibility of executing the trust agreements, he testified that he was not retained by them, that he had never represented or advised them. He did state, however, that he had discussed with the Isabelles the requirements for bringing suits in United States District Court, and that Mr. Bloomer had suggested that "this was the desirable thing to do" in this case. He has never before served as a trustee in such a case as this. Apparently his only service to them has been the relating of such information as he did during the October and December meetings. He agreed with his cross-examiner that the trust arrangement served no function in that connection and that he could as effectively render that service as a consultant.

It does appear, however, that Ferrara is to serve the Isabelles' attorney, Mr. Bloomer, in some advisory or consulting role. Ferrara testified that he was retained solely by Mr. Bloomer to advise him, not the Isabelles, that his services are rendered directly to Mr. Bloomer and that for his services to date he has been paid by the law firm of Bloomer and Bloomer. He came to Vermont in October and December of 1966, he said, as a consultant to Mr. Bloomer. Under the trust agreements he is directed, as trustee, to retain the firm of Bloomer and Bloomer in connection with any lawsuit or other legal matters involving the Isabelles' claims against the defendants. It is also provided there that any "legal fees" charged by the trustee shall be paid by Bloomer and Bloomer. Should Ferrara resign as trustee, or refuse or be unable to serve, provision is made that Bloomer and Bloomer shall select his successor.

But the testimony left in doubt what precise function Ferrara is to perform in his capacity as a consultant to Attorney Bloomer. He is not a physician, but at one point he stated that he was retained not because of his superior knowledge of the law but for his knowledge of medicine and the physical and psychological problems involved in such a case. Later he testified that he was retained by Mr. Bloomer only because he had more than usual experience with the legal problems connected with cases involving paraplegia, although he acknowledged that he has never served as an attorney in a civil action in any United States District Court. Whichever role Ferrara is expected to play, there is no evidence that he has any particular knowledge of the merits of this controversy or that the trust arrangement is either necessary or useful to his performance of either function.

These facts and the legal memoranda submitted by counsel for each of the parties have received careful and deliberate consideration by the Court. In light of the totality of circumstances here present, it is my judgment that this case, by reason of 28 U.S.C. § 1359, is not within the jurisdiction of this Court and the defendants' motions to dimiss on that ground are granted.

At the outset it must be acknowledged that I have not found the issue here presented to be one easily resolved. Section 1359 and its progenitors have led a long and troubled life. The decisions interpreting and applying the statute can be satisfactorily reconciled only with difficulty, if at all.

Section 1359 was first enacted in its present form as part of the 1948 revision of the Judicial Code, Act of June 25, 1948, 62 Stat. 869, 935. It is derived from former sections 41(1) and 80, 28 U.S.C., 1940 edition. The "assignee clause" of section 41(1) was part of the original Judiciary Act of 1789, Act of Sept. 24, 1789, § 11, 1 Stat. 73, 79. Its purpose was to prevent the manufacture of federal jurisdiction by the device of assignment. With changes in language it was carried forward in successive enactments, but at best it accomplished its purpose only partially and in 1948 it was repealed. The present statute is more reminiscent of the provisions of former section 80, which first appeared as section 5 of the Act of March 3, 1875, 18 Stat. 470, 472. It provided in pertinent part:

> "That if, in any suit commenced in a circuit court or removed from a State court to a circuit court of the United States, it shall appear to the satisfaction of said circuit court, at any time after such suit has been brought or removed thereto, * * * that the parties to said suit have been improperly or collusively made or joined, either as plaintiffs or defendants, for the purpose of creating a case cognizable ·or removable under this act, the said circuit court shall proceed no further therein, but shall dismiss the suit or remand it to the court from which it was removed * * *."

There has not been a United States Supreme Court construction of the stat-

ute since its latest re-enactment.[2] But since the essence of the former section 80, particularly its focal words, "improperly or collusively," is carried forward to the present section 1359, it must be assumed that Congress had in mind that Court's interpretation of the predecessor statute and intended the revision to have substantially the same effect. Bradbury v. Dennis, 310 F.2d 73 (10th Cir. 1962); Revisor's Note, 28 U.S.C.A. § 1359. Unfortunately, the experience of nearly a century has demonstrated the inappropriateness of such imprecise terms to establish jurisdictional boundaries. As employed for this purpose, however, they should be viewed as "words of art," acquiring technical jurisdictional meaning through the course of judicial interpretation and application. See Bradbury v. Dennis, supra.

In cases like this one, where one disabled to sue in federal court because he lacks diversity of citizenship with the defendants has transferred an interest in the subject matter of the litigation to the plaintiff prior to suit, the issue of whether the plaintiff was "improperly or collusively" made a party to invoke the jurisdiction of the federal court has often been said to turn on the nature of the transfer. If the transfer is deemed to have been "real," the case is not to be dismissed. Collusion is made out and dismissal follows, however, where the transfer is deemed "fictitious," "feigned," or "merely colorable." See, e. g., Bullard v. City of Cisco, 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254 (1933); Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab, 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681 (1928); Miller & Lux, Inc. v. East Side Canal & Irrigation Co., 211 U.S. 293, 29 S.Ct. 111, 53 L.Ed. 189 (1908); Lehigh Mining & Mfg. Co. v. Kelly, 160 U.S. 327, 16 S.Ct. 307, 40 L.Ed. 444 (1895); Farmington Village Corporation v. Pillsbury, 114 U.S. 138, 5 S.Ct. 807, 29 L.Ed. 114 (1885)

But these terms, in turn, carry broad and indefinite connotations in ordinary parlance, and suffer as much from imprecision as those they are intended to translate into practice. By themselves, they lend little aid to an analysis of the jurisdictional problems created by such transfers and seemingly accomplish little more than to label the ultimate result reached on the particular circumstances appearing in a given case. Few general principles of law appear to be carried forward through the cases to govern decision in subsequent cases presenting different factual contexts. Further, the parties here have been unable to bring to my attention, and I have otherwise been unable to discover, a reported decision so factually analogous to this one as to provide a guiding precedent. Thus, this case presents a challenging question.

A close study of prior decisions however, discloses a number of factors to be considered in separating "real" transactions from the "merely colorable" or "fictitious" and which, in the aggregate, determine the issue of "collusion." Concededly, one searches in vain for a coherent legal theory governing the application of these factors. Many opinions leave the reader much in doubt as to the specific effect attributed by the court to a given circumstance in arriving at the result it reached. Not all of these factors appear in any single case. None of them appears in every case. No one of them, standing alone, is determinative. The best that can be attained under the present state of the law is an empirical formula which calls for judicial inquiry into all the circumstances attending the transfer whereby the plaintiff acquired his interest in the suit, and for a decision on the aggregate effect of those circumstances in the light of prior decisions and the policies underlying the statute.

 Further, there is a presumption against diversity jurisdiction, Le-

---

2. In Smith v. Sperling, 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957), a stockholder's derivative action involving a question of alignment of parties, the Supreme Court touched only tangentially upon 28 U.S.C. § 1359 and did not have occasion to construe the statute in its current form.

high Mining & Mfg. Co. v. Kelly, supra; Bradbury v. Dennis, supra, and where the defendants directly challenge the existence of jurisdiction by alleging that the plaintiff was improperly or collusively made a party to invoke the jurisdiction of this Court, the burden of proof rests on the plaintiff to establish the facts upon which jurisdiction depends. Bradbury v. Dennis, supra; Town of Lantana v. Hopper, 102 F.2d 118 (5th Cir. 1939); Hartmann Coal Mining Co. v. Hoke & Hauptly, 157 F.Supp. 313 (E.D.Pa.1957). It then becomes the duty of the court "to inquire fully into all the circumstances and conditions which surround the making of the assignment or transfer in order that it might determine whether jurisdictional grounds do in fact exist." Steinberg v. Toro, 95 F.Supp. 791, 795 (D.P.R.1951), and cases cited. When all the circumstances attending the transfer in the present case are so scrutinized, it is clear that the facts shown, considered in the light of the pertinent factors discussed below, do not persuasively establish the existence of jurisdiction.

■ Prior to undertaking discussion of those factors, however, it may be well to dispose of one point. The defendants' challenge to jurisdiction under section 1359 is not overcome by demonstrating that the trust instruments transferring technical legal title to the subject matter of the litigation to the plaintiff are valid and legally binding between the parties to it under state law. A "valid" transfer, in this sense, is not synonymous with a "real" transfer in the sense that term is used to delineate jurisdictional limits under the statute. As establish-

ing this principal by implication, see, e. g., Lehigh Mining & Mfg. Co. v. Kelly, supra; Little v. Giles, 118 U.S. 596, 7 S. Ct. 32, 30 L.Ed. 269 (1886); Farmington v. Pillsbury, supra.[3]

■ Section 1359 is a statute governing the jurisdiction of federal courts, and it may be assumed that the Congressional purpose includes uniformity on questions of jurisdiction throughout the federal court system. Diversity jurisdiction should not turn on the legality or validity of the transaction under state law. Bradbury v. Dennis, supra. Therefore, I conclude that it is unnecessary to determine at this time the validity, as assignments[4] and trusts under Vermont law, of the transfers to the plaintiff of the Isabelles' personal injuries claims against the defendants. Those transactions may well govern the rights and duties of the parties to them *inter se*, and yet fail to satisfy the standards by which their effect on the jurisdiction of the federal court is to be determined. For the purposes of this decision, it is sufficient to assume, without deciding, their validity, and to look to the trust instruments and the circumstances surrounding their execution to determine the presence and significance of the following jurisdictional factors.

*Interest in Subject Matter or Outcome of Litigation Retained by Transferor.* One factor which looms large in numerous dismissals under section 1359 and earlier versions of that statute is the fact that the transferor, while conveying some title or interest in the subject matter of the litigation to the plaintiff prior to suit, has retained a substantial inter-

3. Except for Smith v. Sperling, note 2 supra, I am unaware of any Supreme Court decision dealing with section 1359 or its predecessors subsequent to Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Each of the cited cases, therefore, was decided during the reign of Swift v. Tyson, 41 U.S. (16 Pet.) 1, 10 L.Ed. 865 (1842), and hence a clear distinction between the validity of the transfer between the parties to it, as now determined by the substantive law of a given state, and its jurisdictional efficacy under federal law does not appear. Still, in none of the cases does it appear that jurisdiction was held to turn upon the validity of the transfer as determined by "general jurisprudence" under the Swift v. Tyson doctrine.

4. The Supreme Court of Vermont has never passed on the question whether a claim for personal injuries is assignable, and, as stated above, there is no need to decide that question here.

est in or power over that subject matter or a substantial pecuniary interest in the outcome of the litigation. Perhaps none of the pertinent factors is more important or more consistently appears. The cases focusing on this aspect of the transfer are many, but a discussion of a few of them adequately demonstrates the point.

Farmington Village Corporation v. Pillsbury, 114 U.S. 138, 5 S.Ct. 807, 29 L.Ed. 114 (1885), was an action to recover on municipal bond coupons by a citizen of Massachusetts against a Maine municipal corporation. The plaintiff had acquired his interest in the coupons through their assignment to him by the bond owners, all citizens of Maine. In return, the bondholders received non-negotiable notes, payable with interest in two years, and a promise to pay fifty per cent of the net proceeds from the suit on the coupons. The Court determined that the cases to date stood for the proposition that "if the transaction was real and actually conveyed to the assignee or grantee *all the title and interest of the assignor or grantor* in the thing assigned or granted" the suit "would present, in reality, a controversy between the plaintiff on record and the defendants," and dismissal would not be required. 114 U.S. at 143, 5 S.Ct. at 809 (emphasis added). Notwithstanding the assignment by which all right, title and interest to the coupons were formally transferred to the plaintiff, however, the substantial interest of the Maine assignors, in conjunction with other circumstances, was deemed to make that assignment "fictitious" and resulted in dismissal of the case. On the facts of that case, the Court concluded:

> "It is a suit for the benefit of the owners of the bonds. They are to receive from the plaintiff one-half of the net proceeds of the case they have created by their transfer of the coupons gathered together for that purpose. The suit is their own in reality, though they have agreed that the plaintiff may retain one-half of what he collects for the use of his name and his trouble

in collecting. It is true the transaction is called a purchase in the papers that were executed, and that the plaintiff gave his note for $500, but the time for payment was put off for two years, when it was, no doubt, supposed the result of the suit would be known. No money was paid, and as the note was not negotiable, it is clear the parties intended to keep the control of the whole matter in their own hands, so that if the plaintiff failed to recover the money, he could be released from his promise to pay." 114 U.S. at 146, 5 S.Ct. at 810.

Lehigh Mining & Mfg. Co. v. Kelly, 160 U.S. 327, 16 S.Ct. 307, 40 L.Ed. 444 (1895), was a suit to recover possession of lands brought by a Pennsylvania corporation against citizens of Virginia. For twelve years prior, a certain Virginia corporation had claimed the lands in question against the defendants. Shortly before the suit was commenced in federal court, the officers and stockholders of the Virginia corporation incorporated the plaintiff in Pennsylvania and by deed conveyed to the plaintiff all the rights of the Virginia corporation in the disputed land. All the capital stock of the plaintiff corporation was issued to the stockholders of its grantor, which remained in existence, so for the time at least, the stockholders of both the grantee and grantor corporations were identical. Indicating that a "real" transaction is one "by which the title passed without the grantor or vendor reserving *or having* the right *or power* to compel or require a reconveyance or return to him of the property in question," the Court dismissed this case upon concluding that the common body of stockholders of both the plaintiff and the grantor corporation had such power over the subject matter of the suit. 160 U.S. at 336, 16 S.Ct. 307 at 311 (emphasis in original). The Court said:

> "It is true that the technical legal title to the lands in controversy is, for the time, in the [plaintiff]. It is also true that there was no formal agreement upon the part of that corporation

\* \* \* that the title should ever be reconveyed to the Virginia corporation. But when the inquiry involves the jurisdiction of a Federal court—the presumption in every stage of a cause being that it is without the jurisdiction of a court of the United States, unless the contrary appears from the record [citations omitted]—we cannot shut our eyes to the fact that there exists what should be deemed an equivalent to such an agreement, namely, the right *and power* of those who are stockholders of each corporation *to compel* the one holding the legal title to convey, *without a valuable consideration*, such title to the other corporation." 160 U.S. at 336–337, 16 S.Ct. at 311 (emphasis in original).

Thirteen years later, Miller & Lux, Inc. v. East Side Canal & Irrigation Co., 211 U.S. 293, 29 S.Ct. 111, 53 L.Ed. 189 (1908), was dismissed under section 5 of the Act of 1875. In all material respects, the facts paralleled those in *Lehigh Mining*. Here, the plaintiff, a Nevada corporation, was created by those controlling a California corporation, the property in question again being conveyed to the plaintiff prior to the commencement of a diversity suit against California defendants. All of the capital stock of the plaintiff corporation was issued directly to its California grantor, which remained in existence following the conveyance. The Supreme Court held this case to be controlled by *Lehigh Mining*, and based its dismissal primarily on the power of the grantor over the subject matter of the suit derived from its holding of all the capital stock of the plaintiff, concluding that "[t]he prosecution of the suit was really for the benefit of those who were interested in the California corporation." 211 U.S. at 304, 29 S.Ct. at 114.

In *Miller & Lux*, the Court suggested that a different question would have been presented if the California grantor had distributed the stock of the Nevada corporation among the individuals entitled to it and had then been dissolved prior to the commencement of the federal court action. Such a case did appear in Black & White Taxicab & Transfer Co. v. Brown & Yellow Taxicab, 276 U.S. 518, 48 S.Ct. 404, 72 L.Ed. 681 (1928). There suit was brought in federal court by a Tennessee corporation against two Kentucky corporations to enjoin interference with a contract between the plaintiff and one of the defendants. A similar contract between the defendant and the plaintiff's predecessor, also a Kentucky corporation, had allegedly encountered the same interference. Preferring the dispute to be resolved in federal court, the controlling interests in that corporation formed the plaintiff in Tennessee and transferred to it all the business and property of its Kentucky predecessor. The Kentucky corporation was then dissolved, the Tennessee plaintiff entered into the contract in question and suit was instituted. The Court found that this succession and transfer was "actual, not feigned or merely colorable," and refused to dismiss the case, distinguishing *Lehigh Mining* and *Miller & Lux* without discussion.

Jurisdiction was also upheld in Cross v. Allen, 141 U.S. 528, 12 S.Ct. 67, 35 L.Ed. 843 (1891), a foreclosure suit by a citizen of California against a citizen of Oregon. The notes and mortgage in question had been assigned to the plaintiff by a citizen of Oregon, in part at least to create diversity jurisdiction. But dismissal was not required because the transfer of the notes and mortgage had been made for a valuable consideration and the pecuniary interest of the assignor in the subject matter had been completely terminated. The suit, concluded the Court, was for the sole and exclusive benefit of the complainant and his assignor had no interest in its outcome. Similarly, in Crawford v. Neal, 144 U.S. 585, 12 S.Ct. 759, 36 L.Ed. 552 (1892), the defendant's motion to dismiss a judgment creditor's suit on the grounds of collusion was denied where the Court determined that the assignors of the judgments involved had parted with their entire interests and were in no way concerned in the result of the litigation.

Steinberg v. Toro, 95 F.Supp. 791 (D. P.R.1951), a case decided in district court since the re-enactment of section 1359, sets forth a review of this aspect of the decisions under former section 80 of the Code. That was a diversity action against a citizen of Puerto Rico for breach of a contract allegedly assigned by a Puerto Rican corporation to the plaintiff, a director of the corporation and a citizen of New York. The court concluded that the prior decisions established the principle that "if a transfer was real and operated to divest the transferor of all title and interest in and to the subject matter of the transfer, and left the transferor with no residual power of control over said subject matter, a real and actual controversy existed between the parties and jurisdiction was rightfully invoked." 95 F.Supp. at 797. The court dismissed the case, however, following its conclusion that the assignment in question, if made at all, did not operate to divest the assignor completely of all interest in and power of control over the contract. The assignor still retained a residual power of control over the subject matter inconsistent with a real and absolute assignment to the plaintiff.

The suit before this Court is brought solely and exclusively for the benefit of the plaintiff's transferors, the Isabelles. They hold the complete beneficial interest in the subject matter of the transfers in trust and of this litigation. They will regain full legal title to that subject matter or any recovery from this litigation not later than January 1, 1971. Prior to that date, they may exercise their option to revoke the trusts on and after January 1, 1969, or, at any prior time, these trusts may be revoked by mutual consent of the parties to them as done with Mrs. Isabelle's December 9th trust. By contrast, the plaintiff temporarily holds bare legal title in trust and personally has no pecuniary interest in the outcome of the litigation. Even his compensation is not contingent upon the amount of the recovery or upon whether there is any recovery at all.

■ It must be acknowledged, however, that these circumstances, standing alone, are not enough to exclude the case from the jurisdiction of this Court. It is not fatal to jurisdiction that the plaintiff holds the subject matter in express trust for purposes of which his transferors will ultimately be the chief beneficiaries. Bullard v. City of Cisco, 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254 (1933), involving a question of whether numerous small claims, transferred in trust to the plaintiffs, could be aggregated to constitute the requisite jurisdictional amount in controversy, stands for no less than that. This aspect of the case, however, like other circumstances present, is but one of several factors guiding decision. Among other things, the nature of the subject matter held in trust by the plaintiff in each case is significant. The placement of corporate bonds and coupons in the hands of a committee of trustees under a bondholders protective agreement for management and conservation of the investment is a different case from the assignment of personal injury claims to a trust having no apparent purpose other than to create diversity jurisdiction for suit in federal court. Cf. Birkins v. Seaboard Service, 96 F.Supp. 245, 250 (D. N.J.1950). Upon all the circumstances in that case, the Supreme Court in *Bullard* concluded that resort to litigation was not the principal thing in mind at the time of the assignment in trust. I do not reach the same conclusion here.

■ *Motive or Purpose of the Transfers.* That the transferor, in making the transfer whereby the plaintiff acquired his interest in the subject matter of suit, was primarily motivated by a desire to create a diversity of citizenship is a pertinent factor in determining the effect of that transfer on jurisdiction, notwithstanding occasional suggestions to the contrary. While the plaintiff maintains that the creation of diversity jurisdiction was not the motive or purpose of the assignment in trust to him of the Isabelles' claims against the defendants, he insists that such a motive

or purpose is, at any rate, immaterial. I cannot agree.

Certainly it cannot be said that on hearing of this issue before the court evidence tending to show the transferor's motives should be excluded on the ground of immateriality. The very wording of section 1359 indicates that the "improper" or "collusive" making or joining of a party is fatal to the jurisdiction of the district court only if done to "invoke the jurisdiction of such court." At least one court has defined "collusive" assignments to be "those which give bare legal title *only for the purpose* of creating jurisdiction." Consolidated Rubber Tire Co. v. Ferguson, 183 F. 756 (2d Cir. 1910) (emphasis added).

 The argument advanced by the plaintiff here was specifically rejected by the Supreme Court in *Lehigh Mining*. It is true, as the Court pointed out, that the right of a citizen of one state to sue a citizen of another state in federal court is not defeated *merely* because of a motive to create diversity jurisdiction. Such motive is but one of several considerations to be taken into account and where, upon consideration of all other pertinent factors, the transfer to the plaintiff is established as a "real" transaction, the motive of the transferor, standing alone, will not defeat the jurisdiction. Steinberg v. Toro, supra, 95 F. Supp. at 797. Compare Lake County Comm'rs v. Dudley, 173 U.S. 243, 19 S. Ct. 398, 43 L.Ed. 684 (1899); Lehigh Mining & Mfg. Co. v. Kelly, supra; Farmington v. Pillsbury, supra; and Williams v. Nottawa, 104 U.S. 209, 26 L.Ed. 719 (1881) with Bullard v. City of Cisco, supra; Black & White Taxicab v. Brown & Yellow Taxicab, supra; Crawford v. Neal, supra; and Cross v. Allen, supra.

 This rule does not preclude inquiry into the motives of the transferor for making the transfer, however, where the question of whether the transfer to the plaintiff was a "real" one is in issue. Steinberg v. Toro, supra. Compare Black & White Taxicab v. Brown & Yel-

low Taxicab, supra. In making that determination, his motive is always an important consideration. Amar v. Garnier Enterprises, Inc., 41 F.R.D. 211 (C.D. Calif.1966).

In the present case the nature of the transfers to the plaintiff Ferrara is very much in issue. Nothing in the evidence suggests that the trusts serve any purpose in connection with the services Mr. Ferrara purportedly has been retained to render. On the contrary, his own testimony is that he is a consultant of some sort to the Isabelles' attorney, an objective which he acknowledges is in no way promoted by the assignment to him of the Isabelles' claims for damages. On the other hand there is one asset Mr. Ferrara can lend to the Isabelles and that is his New Jersey citizenship. The Isabelles themselves could not have sued these defendants in this Court. It is clear, however, that suit here was discussed, and deemed a desirable course by their attorney. One of the duties of Ferrara as trustee under the agreements was to bring suit against these defendants. But, prior to the final execution of those instruments, state court actions against all these defendants had already been commenced by the Isabelles; where else but federal court was the trustee to bring the suit he was directed to institute? On all the evidence, I am persuaded that the sole purpose of these assignments in trust to a nonresident stranger was simply to create the diversity of citizenship between the plaintiff and the defendants requisite to federal jurisdiction.

 *Solicitation of the Plaintiff to Bring Suit and Reimbursement for Costs and Expenses; Control of the Litigation.* To support a charge that the plaintiff has been improperly or collusively made a party to a diversity action, the defendant may be able to show that there are others, lacking the citizenship necessary to jurisdiction, who have an equal or greater interest than the plaintiff in the outcome of the suit brought in his name. It may further appear that such persons sought out the plaintiff to urge him to bring suit in federal court and agreed to

indemnify him against all costs and expenses of that litigation. Where the plaintiff himself held an interest in the subject matter of the proposed litigation prior to such solicitation and agreement, and hence would have been entitled at that time to bring his own suit, it has been held that these circumstances, without more, are insufficient to make out collusion. Wheeler v. City & County of Denver, 229 U.S. 342, 33 S.Ct. 842, 57 L.Ed. 1219 (1913); Allstate Ins. Co. v. Lumbermens Mut. Cas. Co., 204 F.Supp. 83 (D.Conn.1962); First Congregational Church and Soc. of Burlington, Iowa v. Evangelical and Reformed Church, 160 F.Supp. 651 (S.D.N.Y.1958).

But a distinction has been drawn between such cases and one where the plaintiff first acquired his interest in the subject matter from the other interested but disabled persons following, or in conjunction with, their inducement and agreement to bear his expenses. In the latter case, the solicitation is in effect that the plaintiff *become* interested so that he might be *able* to bring the suit, and a dismissal for collusion is warranted. Amar v. Garnier Enterprises, Inc., supra.

Even where the solicitation and agreement to bear expenses are not a part of a transfer agreement with the plaintiff, dismissal may result where these factors are joined by a finding that others interested in the outcome, rather than the plaintiff, are in control of the conduct of the litigation. The leading example of this principle is Cashman v. Amador & Sacramento Canal Co., 118 U.S. 58, 6 S.Ct. 926, 30 L.Ed. 72 (1886). Sacramento County, California, sought to enjoin a California corporation from dumping of debris in a river. The absence of diversity of citizenship stood in the way of the county officials' desire to have the matter determined in federal court, so they sought out the plaintiff, an alien and riverbank landowner, and induced him to bring the suit in federal court. An agreement was executed providing that the county would pay all the expenses of litigation, hold the plaintiff

harmless from costs, supply him with counsel and pay their fees. It was further agreed that the county and its appointed attorneys would manage and control the litigation. Although there had been no conveyance of property to the plaintiff, his surrender of control to "non-diverse" interests caused the Supreme Court to conclude that the case in reality presented a controversy between the county and the defendant, both of California citizenship, and to dismiss the case for lack of jurisdiction.

The relationship between these circumstances has perhaps been most succinctly stated in Matthies v. Seymour Mfg. Co., 23 F.R.D. 64 (D.Conn.1958) (rev'd on other grounds, 270 F.2d 365 (2d Cir. 1959)), by District (now Circuit) Judge Smith:

"The fact that a non-resident is induced to bring suit and reimbursed for his expenses by another or others equally interested but disabled to sue is not necessarily proof of collusion. [citations omitted] However, if, to these factors is added proof that the plaintiff thus induced and reimbursed is not in fact the master of the litigation, and that he has surrendered or never had control of the suit, such control reposing in another who cannot sue because of non-diversity, then a finding of collusion is warranted. [citations omitted]. Control is thus the decisive factor." 23 F.R.D. at 84.

Concluding that the plaintiff in that case had not surrendered control of his suit, Judge Smith distinguished *Cashman* and upheld jurisdiction.

Control over the conduct of the litigation may indeed be seen as a very influential factor in its own right and need not always appear in conjunction with solicitation to sue and reimbursement for expenses. For example, in Farmington Village Corporation v. Pillsbury, supra, the plaintiff, assignee of bond coupons, paid no cash to his assignors. Instead, he gave non-negotiable notes, payable in two years, by which time the parties to the assignment assumed the results of the suit on those coupons would

be known. Concluding from these circumstances that the assignors intended "to keep control of the whole matter," the Supreme Court dismissed the case as collusive. In Southern Realty Investment Co. v. Walker, 211 U.S. 603, 29 S.Ct. 211, 53 L.Ed. 346 (1909), two Georgia attorneys, representing Georgia clients wishing to litigate land controversies against other Georgia citizens in federal court, formed the plaintiff, a South Dakota corporation, and caused the lands in question to be conveyed to it. On the facts appearing in that case, it was held that the plaintiff corporation had no "will of its own," was "completely dominated" by and was "merely the agent" of the Georgia attorneys. Judgment of dismissal was affirmed.

Numerous incidental circumstances, varying from case to case, have been taken by the courts as evidence that the plaintiff was not in control of the litigation brought in his name. The same evidence may often operate to demonstrate for whose benefit the action is primarily brought as well. Thus, it may appear that the plaintiff has little or no knowledge regarding the subject matter or the merits of his federal court litigation. See, e. g., Hayden v. Manning, 106 U.S. 586, 1 S.Ct. 617, 27 L.Ed. 306 (1882); Little v. Giles, supra; Amar v. Garnier Enterprises, Inc., supra. The circumstances of the case may reveal a history of state court litigation on the part of the plaintiff's transferor prior to the transfer to the plaintiff and commencement of his federal action involving the same subject matter against the same defendants. These circumstances led one court to conclude that the plaintiff's suit was in fact "but another battle in the same campaign." Amar v. Garnier Enterprises, Inc., supra, 41 F.R.D. at 215. See also, Miller & Lux, Inc. v. East Side Canal & Irrigation Co., supra; Farmington v. Pillsbury, supra. Occasionally it will appear that the plaintiff is represented in federal court by the same attorneys who represented his transferor in such prior litigation, or otherwise in connection with the same subject matter.

See, e. g., Southern Realty Co. v. Walker, supra; Little v. Giles, supra; Amar v. Garnier Enterprises, Inc., supra.

■ Each case must stand on its own circumstances, but certainly when all these circumstances appear, it is difficult to conclude that the plaintiff is in control of the litigation. Here it is obvious that the plaintiff Ferrara has "far less at stake" in this suit than his nondiverse assignors. See Amar v. Garnier Enterprises, supra, 41 F.R.D. at 216. What interest he does have he acquired by way of the trust instruments, which direct him to institute litigation regarding the subject matter of the transfers and expressly provide that he is to be reimbursed for his expenses. As shown, the only litigation contemplated was federal court litigation.

The efforts of the Isabelles to obtain recovery against the same defendants in other lawsuits commenced immediately prior to the assignments to Ferrara and still pending, are shown by undisputed evidence. The attorney representing the Isabelles in those cases also appears for the plaintiff here. Further, all the trust agreements upon which the plaintiff relies here were drawn by that same attorney, who represents both the beneficiaries and the trustee. Those instruments expressly provide that all legal matters connected with the claims involved must be handled by the firm of Bloomer and Bloomer; the plaintiff is not permitted to choose another lawyer to conduct the litigation brought in his name. His own testimony establishes that he is retained by that firm and paid by that firm; his successor, if any, is to be chosen by that firm. Perhaps he is best described as "merely the agent" of his transferors' attorney. Certainly it cannot be said that he is "the master of the litigation."

■ Should there remain any doubt as to the proper disposition of this case, it must be resolved against jurisdiction. This Court has an affirmative duty "jealously to scrutinize its own jurisdiction." Pure Oil Co. v. Puritan Oil Co., 127 F.2d 6, 8 (2d Cir. 1942). In defining

the boundaries of diversity jurisdiction, the federal courts must be mindful of the guiding Congressional policy "of jealous restriction, of avoiding offense to state sensitiveness, and of relieving the federal courts of the overwhelming burden of 'business that intrinsically belongs to the state courts.'" City of Indianapolis v. Chase National Bank, 314 U.S. 63, 76, 62 S.Ct. 15, 20, 86 L.Ed. 47 (1941).

Federal district courts are courts of limited jurisdiction. That jurisdiction extends no farther than it has been conferred by Congress. Sheldon v. Sill, 49 U.S. (8 How.) 441, 12 L.Ed. 1147 (1850). The general grant of diversity jurisdiction, 28 U.S.C. § 1332(a) (1), is limited by 28 U.S.C. § 1359. "The clear purpose of that legislation has been to close the federal courts to litigants who properly should litigate their controversies in state tribunals except where there exists a real diversity of citizenship." Steinberg v. Toro, supra, 95 F. Supp. at 795. To sustain jurisdiction in this case would be to ignore that purpose, and to emasculate not only section 1359 but section 1332(a) (1) as well. The result, in practical terms, would be to extend diversity jurisdiction to essentially every civil action involving an amount in controversy in excess of $10,-000,[5] flooding already crowded dockets[6] of the federal district courts with "suits of which neither the framers of the constitution nor congress ever intended they should take cognizance." Lehigh Mining & Mfg. Co. v. Kelly, supra, 160 U.S. at 343, 16 S.Ct. at 314. Neither the language of section 1359 nor any prior decision suggests that result.[7]

5. Furthermore, in personal injury cases at least, the effectiveness of the amount-in-controversy requisite to diversity jurisdiction in limiting access to the federal courts is doubtful. "The general federal rule has long been to decide what the amount in controversy is from the *complaint itself*, unless it appears or is in some way shown that the amount stated in the complaint is not claimed 'in good faith.' In deciding the question of good faith, we have said that it 'must appear to a *legal certainty* that the claim is really for less than the jurisdictional amount to justify dismissal.'" Horton v. Liberty Mut. Ins. Co., 367 U.S. 348, 353, 81 S.Ct. 1570, 1573, 6 L.Ed.2d 890 (1961) (emphasis added).

6. See, e. g., Horton v. Liberty Mut. Ins. Co., supra note 5, 367 U.S. at 350–351, 81 S.Ct. 1570; Wright, The Federal Courts—a Century After Appomattox, 52 A.B.A.J. 742, 743 (1966).

7. This Court is cognizant of Corabi v. Auto Racing, Inc., 264 F.2d 784, 75 A.L.R.2d 711 (3d Cir. 1959) and Lang v. Elm City Constr. Co., 324 F.2d 235 (2d Cir. 1963). In *Corabi*, the Third Circuit held that the appointment of a non-resident administrator, d. b. n., for the express purpose of creating diversity in a wrongful death action did not violate 28 U.S.C. § 1359. The same result was adopted by the Second Circuit in *Lang*. If the present case presented the same question and the same factual situation existing in *Corabi* and *Lang*, the decision of this Court would be controlled by those decisions and jurisdiction would be sustained.

Cases involving a transfer of the plaintiff's interest in the litigation from those for whose benefit the suit is brought, however, have consistently been analyzed and decided in prior decisions on considerations different from those upon which jurisdiction in the appointment cases has been upheld. The latter cases involve no transfer, so the factors examined by the courts as bearing on the nature of the transfer are irrelevant. Entire discretion and control of the administration rests in the non-resident administrator, subject to the direction and approval of the court appointing him.

The nonresident administrator is appointed by decree of a state court of competent jurisdiction pursuant to statutes authorizing such appointment. He does not acquire his standing through a direct transaction between himself and the beneficiaries of the litigation he is to institute. Cf. Manhattan Life Ins. Co. v. Broughton, 109 U.S. 121, 3 S.Ct. 99, 27 L.Ed. 878 (1883). It has often been said that such a decree of the state probate court cannot be collaterally attacked when deciding questions of federal court jurisdiction. See, e. g., Mecom v. Fitzsimmons Drilling Co., Inc., 284 U.S. 183, 52 S.Ct. 84, 76 L.Ed. 233 (1931); Corabi v. Auto Racing, Inc., supra; Jaffe v. Philadelphia & Western R. Co., 180 F.2d 1010 (3d Cir. 1950). The administrator has rights and duties regarding institution or settlement of the suit, distribution of its pro-

"This is not a sacrifice of justice to technicality." City of Indianapolis v. Chase National Bank, supra, 314 U.S. at 76, 62 S.Ct. at 20. Nothing said herein is intended to detract from the gravity of the events and consequences alleged in the complaint. Justice may well require that the injured parties be awarded a substantial recovery. The question is not the justice of their cause but rather where that matter should be tried and determined. The answer is in state court, not here.

Accordingly, it is ordered that Civil Actions 4753 and 4754 be dismissed on the grounds stated and judgment for the defendants be entered.

ceeds, and control over its conduct which are imposed and defined by statute, not by arrangement with the ultimate beneficiaries. Mecom v. Fitzsimmons Drilling Co., supra; Loegering v. Todd County, 185 F.Supp. 134 (D.Minn. 1960). Cf. O'Donnell v. Hayden Truck Lines, 61 F.Supp. 823 (D.Conn.1945).