Stanley KNAPP, Jr., Appellant,

v.

NORTH AMERICAN ROCKWELL CORPORATION

v.

MRS. SMITH'S PIE COMPANY, Third-Party-Defendant.

No. 74–1110.

United States Court of Appeals, Third Circuit.

Argued Sept. 10, 1974.

Decided Dec. 27, 1974.

---

**362**

Howard J. Creskoff, Freedman, Borowsky & Lorry, Philadelphia, Pa., for appellant.

William F. Sullivan, Jr., Robert M. Britton, Barton L. Post, Post & Schell, P. A., Philadelphia, Pa., for appellee.

Before ALDISERT, ADAMS and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The principal question here is whether it was error to grant summary judgment on the ground that one injured by a defective machine may not recover from the corporation that purchased substantially all the assets of the manufacturer of the machine because the transaction was a sale of assets rather than a merger or consolidation.

### I.

Stanley Knapp, Jr., an employee of Mrs. Smith's Pie Co., was injured on October 6, 1969, when, in the course of his employment, his hand was caught in a machine known as a "Packomatic." The machine had been designed and manufactured by Textile Machine Works (TMW) and had been sold to Mrs. Smith's Pie Co. in 1966 or 1967.

On April 5, 1968, TMW entered into an agreement with North American Rockwell whereby TMW exchanged substantially all its assets for stock in Rockwell. TMW retained only its corporate seal, its articles of incorporation, its minute books and other corporate records, and $500,000. in cash intended to cover TMW's expenses in connection with the transfer.[1] TMW also had the right, prior to closing the transaction with Rockwell, to dispose of land held by TMW or its subsidiary. Among the assets acquired by Rockwell was the right to use the name "Textile Machine Works."[2] TMW was to change its name on the closing date, then to distribute the Rockwell stock to its shareholders and to dissolve TMW "[a]s soon as practicable after the last of such distributions."

The accord reached by Rockwell and TMW also stipulated that Rockwell would assume specified obligations and liabilities of TMW, but among the liabilities not assumed were: "(a) liabilities against which TMW is insured or otherwise indemnified to the extent of such insurance or indemnification unless the insurer or indemnitor agrees in writing to insure and indemnify [Rockwell] to the same extent as it was so insuring and indemnifying TMW."

Closing took place pursuant to the agreement on August 29, 1968. Plaintiff sustained his injuries on October 6, 1969. TMW was dissolved on February 20, 1970, almost 18 months after the bulk of its assets had been exchanged for Rockwell stock.

Plaintiff filed this suit against Rockwell in the district court on March 22, 1971. He alleged that his injuries result-ed from the negligence of TMW in designing and manufacturing the machine and that Rockwell, as TMW's successor, is liable for such injuries. Rockwell joined plaintiff's employer, Mrs. Smith's Pie Co., as a third-party defendant.[3]

Rockwell moved for summary judgment in the district court on June 19, 1973. On September 6, 1973, the district court granted the motion, ruling that Rockwell had neither merged nor consolidated with TMW, that Rockwell was not a continuation of TMW, and that Rockwell had not assumed TMW's liability to Knapp. Therefore, the court concluded, Rockwell was not responsible for the obligations of TMW. On October 11, 1973, Knapp filed a motion for rehearing and reconsideration by the district court, which was denied on November 26, 1973. Knapp appealed to this Court on December 11, 1973.[4]

## II.

Both parties agree that this case is controlled by the following principle of law:

The general rule is that "a mere sale of corporate property by one company to another does not make the purchaser liable for the liabilities of the seller not assumed by it." . . . There are, however, certain exceptions to this rule. Liability for obligations of a selling corporation may be imposed on the purchasing corporation when (1) the purchaser expressly or impliedly agrees to assume such obligations; (2) the transaction amounts to a consolidation or merger of the selling corporation with or into the purchasing corporation; (3) the purchasing corpora-

1. Any of the $500,000. remaining at the time of the dissolution of the Textile Machine Corporation was to be returned to Rockwell.

2. In this opinion, "Textile Machine Works" and "TMW" refer only to the corporation which agreed to sell its assets to Rockwell and then to dissolve.

3. On July 13, 1972, after Rockwell had denied responsibility for any liability TMW may have had to Knapp, Knapp sued TMW in a Pennsylvania state court to recover for his injuries. That suit was barred, however, either by the two year statute of limitations on personal injury actions [12 Pa.Stat.Ann. § 31] or by the statute requiring that suits against a dissolved corporation be commenced within two years of the date of dissolution [15 Pa. Stat.Ann. § 2111 (Supp.1974)].

4. Rockwell moved to dismiss the appeal, alleging that the notice of appeal was not timely filed. Since another panel of this Court denied the motion to dismiss the appeal on February 27, 1974, this panel may not review that decision.

tion is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for such obligations.

Shane v. Hobam, Inc., 332 F.Supp. 526, 527–528 (E.D.Pa.1971) (citations omitted) (decided under New York law).

In light of this language, Knapp contends that the transaction in question "amounts to a consolidation or merger of [TMW] with or into the purchasing corporation [Rockwell]" or, alternatively, that Rockwell is a "continuation" of TMW. Although the TMW corporation technically continued to exist until its dissolution approximately 18 months after the consummation of the transaction with Rockwell, TMW was, Knapp argues, a mere shell during that period. It had none of its former assets, no active operations, and was required by the contract with Rockwell to dissolve itself "as soon as practicable." Knapp urges in effect that the transaction between TMW and Rockwell should be considered a de facto merger.[5]

Rockwell asserts, in defense of the district court's grant of summary judg-

ment, that a merger, a consolidation and a continuation all require that the corporation being merged, consolidated or continued cease to exist. TMW, Rockwell claims, did not go out of existence at the time of the exchange with Rockwell, but continued its corporate life for 18 months thereafter. Further, Rockwell argues, TMW until its dissolution possessed assets of substantial value, in the form of Rockwell stock.[6]

### III.

In a diversity case, the federal court must apply the rule of law which would govern if suit were brought in a court of the forum state.[7] We must, therefore, determine how this case would be decided by a Pennsylvania court.

All jurisdictions which have considered the question appear to have accepted not only the general rule that a corporation which purchases the assets of a second corporation is not thereby liable for the obligations of the selling corporation, unless there exists one of the exceptions set out in Shane, supra p. 364.[8]

---

**5.** In addition, Knapp asserts that the district court erred in granting the defendant's motion for summary judgment because there remains a material issue of fact relating to whether Rockwell expressly assumed any liability TMW may have to Knapp. The agreement between TMW and Rockwell stated that Rockwell would not assume those liabilities of TMW for which TMW was insured "unless the insurer or indemnitor agrees in writing to insure and indemnify [Rockwell] to the same extent it was so insuring and indemnifying TMW." On the basis of the record before the district court, there was, according to Knapp, a material issue of fact remaining, since there had been no showing that the relevant insurer had not agreed to so protect Rockwell.

**6.** As to Knapp's contention regarding the assumption of TMW's liabilities, Rockwell claims there was no material issue of fact relating to that issue. The operative document with respect to the assumption of TMW's obligations, Rockwell contends, is not the agreement of sale dated April 5, 1968, but the instrument executed by Rockwell August 29, 1968, which stipulates that Rockwell "hereby assumes and agrees to pay" all debts of TMW except "(a) liabilities against which TMW is insured or otherwise indemnified to

the extent of such insurance or indemnification," without further qualification. Therefore, in Rockwell's view, it is clear Rockwell has not assumed the liability to Knapp. Furthermore, counsel for Rockwell has submitted to this Court with his brief an affidavit of the Assistant General Counsel of Rockwell averring that no liability insurance policies were transferred from TMW to Rockwell and no insurance company has agreed to indemnify Rockwell as it had previously insured TMW.

**7.** Commissioner of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).

**8.** See, e. g., Forest Laboratories v. Pillsbury Co., 452 F.2d 621 (7th Cir. 1971); West Texas Refining & Dev. Co. v. Commissioner of Internal Revenue, 68 F.2d 77 (10th Cir. 1933); Bazan v. Kux Mach. Co., 358 F.Supp. 1250 (E.D.Wis.1973); Shane v. Hobam, Inc., 332 F.Supp. 526 (E.D.Pa.1971) (decided under New York law); Kloberdanz v. Joy Mfg. Co., 288 F.Supp. 817 (D.Colo.1968); Copease Mfg. Co. v. Cormac Photocopy Corp., 242 F.Supp. 993 (S.D.N.Y.1965); J. F. Anderson Lumber Co. v. Myers, 296 Minn. 33, 206 N.W.2d 365 (1973); McKee v. Harris-Seybold Co., 109 N.J.Super. 555, 264 A.2d 98 (L.Div.1970) aff'd

Under *Shane,* the first of the four exceptions rendering the purchasing corporation liable for duties of the seller is a transaction amounting to a merger or consolidation. In a merger a corporation absorbs one or more other corporations, which thereby lose their corporate identity. "A merger of two corporations contemplates that one will be absorbed by the other and go out of existence, but the absorbing corporation will remain."[9] In a consolidation, on the other hand, "all the combining corporations are deemed to be dissolved and to lose their identity in a new corporate entity which takes over all the properties, powers and privileges, as well as the liabilities, of the constituent companies."[10] Another of the *Shane* exceptions to the general rule of nonliability arises when there is a continuation. In a continuation, a new corporation is formed to acquire the assets of an extant corporation, which then ceases to exist. "[T]here is in effect but one corporation which merely changes its form and ordinarily ceases to exist upon the creation of the new corporation which is its successor."[11]

No prior cases decided under Pennsylvania law have addressed the problem presently before this Court. However, when courts from other jurisdictions have considered similar questions, they have ascertained the existence *vel non* of a merger, a consolidation or a continuation on the basis of whether, immediately after the transaction, the selling corporation continued to exist as a corporate entity and whether, after the transaction, the selling corporation possessed substantial assets with which to satisfy the demands of its creditors.

Thus, in Bazan v. Kux Machine Co.,[12] the plaintiff was injured in 1966 by a machine purchased by his employer from Kux Machine Co. in 1961. In 1963, after the sale of the machine to plaintiff's employer but prior to the accident, Kux sold to the Wickes Corporation the bulk of Kux's assets, retaining only its accounts receivable, its prepaid insurance and its real estate. Wickes acquired Kux' tangible personal property, licenses, trademarks, patents, good will, and the exclusive right to use the name "Kux Machine." Kux, after changing its name, remained in existence for ten months before dissolving as required by the contract with Wickes. The court held that the transaction was not a merger, consolidation or continuation. It reasoned that Kux continued to exist for a substantial period after the exchange, that the transaction was a cash sale rather than an exchange of stock, and that none of the owners or management of the seller acquired any interest in the buyer.

Similarly, in McKee v. Harris-Seybold Co.[13] the court held that there had been no merger or consolidation between the alleged tortfeasor and the purchaser of its assets. The plaintiff was injured in 1968 by a paper-cutting machine manufactured in 1916 by the Seybold Machine Co. In 1926, Seybold agreed to sell its assets to Harris Automatic Press Co. In exchange, Harris agreed to give Seybold cash plus common stock in Harris, and to assume certain of Seybold's liabilities.

---

per curiam 118 N.J.Super. 480, 288 A.2d 585 (1972); Comstock v. Great Lakes Distributing Co., 209 Kan. 306, 496 P.2d 1308 (1972); Schwartz v. McGraw-Edison Co., 14 Cal. App.3d 767, 92 Cal.Rptr. 776 (1971); Lamb v. Leroy Corp., 85 Nev. 276, 454 P.2d 24 (1969); Buis v. Peabody Coal Co., 41 Ill.App.2d 317, 190 N.E.2d 507 (1963).

9. Applestein v. United Board & Carton Corp., 60 N.J.Super. 333, 159 A.2d 146, 151 (Ch. 1960) aff'd per curiam 33 N.J. 72, 161 A.2d 474 (1960). *Accord* Freeman v. Hiznay, 349 Pa. 89, 36 A.2d 509 (1944); 15 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7040–41 (1973).

10. *Freeman, supra* 349 Pa. at 94, 36 A.2d at 511. *Accord* Applestein, *supra;* 15 Fletcher, *supra* §§ 7040–41.

11. Fletcher, *supra,* § 7205. *See* Forest Laboratories v. Pillsbury Co., 452 F.2d 621, 626 (7th Cir. 1971); Kloberdanz v. Joy Mfg. Co., 288 F.Supp. 817, 821 (D.Colo.1968).

12. 358 F.Supp. 1250 (E.D.Wis.1973).

13. 109 N.J.Super. 555, 264 A.2d 98 (L.Div. 1970) aff'd per curiam, 118 N.J.Super. 480, 288 A.2d 585 (1972).

Harris acquired all the assets of Seybold including its good will and the exclusive use of the name "Seybold Machine Co." Seybold agreed to change its name and not to engage in any manufacturing activities. Seybold continued to exist under a different name for one year after the exchange. Prior to the consummation of the transaction Harris assigned its interest in the contract to a new corporation formed for the purpose. The new corporation was later renamed the Harris-Seybold Co. The court held that Harris-Seybold was not liable for the plaintiff's injuries because there had been no merger or consolidation between the Harris and Seybold corporations. Nor, the court ruled, was Harris or Harris-Seybold a continuation of Seybold. After observing that this was not an exchange for securities alone, the court stressed that "[t]he identity of the [Seybold] corporation and of its stockholders as an integral part of the corporate identity was not eradicated by the transfer." 264 A.2d at 104. The court set forth its rationale in the following passage:

> The corporation could no longer function as a manufacturer, yet it could and did operate and function as a corporation for some time after the sale. The vendor corporation, as a corporate entity, was not absorbed into the purchasing corporation. What was absorbed was the nature of the manufacturing operations previously engaged in by Seybold, not the corporate entity itself. *Id.*

The court's analysis was that "[i]f the vendor corporation receives the consideration for the transfer, as opposed to those situations where the stockholders directly receive the same, and that corporation is thereby kept alive, there seems to be nothing in the nature of a merger or consolidation." *Id.* ·

The Nevada Supreme Court reached the same conclusion in Lamb v. Leroy Corp.[14] There, a contract creditor of Nevada Land and Mortgage Co. sought to enforce his claim against the Leroy Corp. Shares in Leroy were exchanged in 1965 for all the assets of Nevada Land exclusive of two items of real estate Leroy did not want and some incidental cash. A certificate representing the stock was delivered to Nevada Land. "Soon after the consummation of [the] transaction,"[15] Nevada Land distributed the Leroy shares to its shareholders and dissolved, without satisfying Lamb's claim. The court concluded that the transaction was not a merger or a consolidation, on the basis that the consideration was adequate, that Leroy delivered the shares to Nevada Land rather than to its shareholders, and that the subsequent dissolution was a separate transaction.

This cluster of cases[16] illustrates the significance which the decisions from other jurisdictions accord to corporate theory and the continued existence of the corporate entity. The adequacy of the consideration received by the selling corporation has also been given great weight in deciding the existence of a sale as contrasted with a merger or continuation. In *Lamb, supra,* the court pointed out that the consideration was adequate, since the selling corporation received a valuable asset—the purchaser's stock—which for the remainder of the life of the corporation was exposed to the claims of the seller's creditors. Similarly, the court emphasized in *McKee, supra,* that the selling corporation had received substantial value for its assets, and that there was no hint the selling corporation was being denuded of

---

**14.** 85 Nev. 276, 454 P.2d 24 (1969).

**15.** The opinion gives no more precise statement of the time.

**16.** *See also,* Forest Laboratories v. Pillsbury Co., 452 F.2d 621 (7th Cir. 1971); West Texas Refining & Dev. Co. v. Commissioner of Internal Revenue, 68 F.2d 77 (10th Cir. 1933); Kloberdanz v. Joy Mfg. Co., 288 F.Supp. 817 (D.Colo.1968); Copease Mfg. Co. v. Cormac Photocopy Corp., 242 F.Supp. 993 (S.D.N.Y. 1965); J. F. Anderson Lumber Co. v. Myers, 296 Minn. 33, 206 N.W.2d 365 (1973); Schwartz v. McGraw-Edison Co., 14 Cal. App.3d 767, 92 Cal.Rptr. 776 (1971); Buis v. Peabody Coal Co., 41 Ill.App.2d 317, 190 N.E.2d 507 (1963).

assets with which it might satisfy the claims of its creditors. The district court for the District of Colorado, in Klober-danz v. Joy Mfg. Co.,[17] stated that "the emphasis should be on whether the sale was a bona fide one involving the payment of money or property to the selling corporation whereby it can respond [in damages] in actions like the present one."

In Jackson v. Diamond T. Trucking Co.,[18] the court found the purchasing corporation to be a continuation of the selling corporation because the "purchaser" took all the assets of the "seller" in return for nominal consideration only. Similarly, in Ruedy v. Toledo Factories Co.[19] and Hoche Productions v. Jayark Films Corp.,[20] the courts concluded that the transactions were mergers after the "selling" corporations were left without appreciable assets to satisfy the claims of their creditors.

## IV.

The cases discussed above, all decided under the law of jurisdictions other than Pennsylvania, may suggest that the arrangement between Rockwell and TMW should be considered a sale rather than a merger or a continuation, since TMW did not officially terminate its corporate existence for 18 months after the exchange, and throughout that period possessed valuable assets with which to respond to tort claims similar to the one now advanced. However, a number of considerations indicate the insubstantiality of the continued existence of TMW, including the brevity of the corporation's continued life, the contractual requirement that TMW be dissolved as soon as possible, the prohibition on engaging in normal business transactions, and the character of the assets TMW controlled. Although each of these factors was present in one or more of the above cases, the present appeal is unique in combining all these elements. In addition, the better-reasoned result would be to conclude that, for the purpose of determining liability to tortiously injured parties, the Rockwell-TMW transaction should be treated as a merger, thereby subjecting Rockwell to liability for injuries caused by defective products distributed by TMW prior to the transaction.

We must, of course, apply the rule we believe a Pennsylvania appellate tribunal would adopt if the case arose in the state courts. In resolving issues relating to the recognition of a cause of action in favor of an injured party, the Pennsylvania courts have emphasized the public policy considerations served by imposing liability on the defendant rather than formal or technical requirements.[21]

The Pennsylvania Supreme Court has held, in the context of the rights of dissenting shareholders, that if an agreement between two corporations bears the essential character of a merger, the failure of the contracting parties to follow the statutory merger procedures should not deprive third parties of relief otherwise available to them. By Pennsylvania statute, when two corporations are merged, the surviving corporation becomes liable for the obligations of the corporation which ceases to exist.[22] Also, any shareholder of a merging corporation who is dissatisfied with the merger plan may obtain a valuation of his shares.[23]

---

17.  288 F.Supp. 817, 820 (D.Colo.1968).

18.  100 N.J.Super. 186, 241 A.2d 471 (L.Div. 1968).

19.  61 Ohio App. 21, 22 N.E.2d 293 (1939).

20.  256 F.Supp. 291 (S.D.N.Y.1966).

21.  Some indication of the probable reaction of the Pennsylvania Supreme Court to the issue posed by this case may perhaps be gleaned from that Court's discussion in Kassab v. Central Soya, 432 Pa. 217, 246 A.2d 848 (1968), and Salvador v. Atlantic Steel Boiler Co., Pa., 319 A.2d 903 (1974). Although the issues presented in *Kassab* and *Salvador* turned on the doctrine of privity, which is not present here, the reasoning utilized by the Supreme Court in those cases dealt with the economic reality of the relationship between manufacturers and the users of the allegedly defective products.

22.  15 Pa.Stat.Ann. § 1907 (1967).

23.  15 Pa.Stat.Ann. § 1908 (1967).

In Farris v. Glen Alden Corp.,[24] a shareholder of Glen Alden sought to enjoin a meeting of Glen Alden shareholders called to approve a "reorganization agreement" with List Industries. Plaintiff asked that the meeting be enjoined because management had failed to inform the shareholders that the purpose of the meeting was the approval of a merger and that the shareholders had a right to dissent from the merger and obtain a valuation of their stock. Management responded that the shareholders had no valuation rights because the transaction did not conform to the statutory merger procedures and therefore was not a merger, but a sale of assets to which valuation rights did not apply. Pursuant to the plan of reorganization, Glen Alden was to acquire all the assets of List except a small amount of cash reserved for payment of expenses in connection with the transaction. In exchange, Glen Alden was to assume all List's liabilities and to issue stock to List that List would distribute to its stockholders. List was then to dissolve and Glen Alden to change its name to List Alden.

The Court expressed the view in Farris that because of the complexities of modern corporate reorganizations,

> it is no longer helpful to consider an individual transaction in the abstract and solely by reference to the various elements therein determine whether it is a "merger" or a "sale". Instead, to determine properly the nature of a corporate transaction, we must refer not only to all the provisions of the agreement, but also to the consequences of the transaction and to the

purposes of the provisions of the corporation law said to be applicable.[25]

The rationale of dissenting shareholders' rights, the Court stated, is to allow shareholders to treat their membership in the original corporation as terminated when the corporation, in combining with another, "lose[s] its original nature." The List-Glen Alden agreement, the Court held, fundamentally altered the relationship between Glen Alden and its shareholders, and therefore the provisions relating to dissenting shareholders' rights should apply.[26]

The present case, like Farris, involves a transaction which resembles a merger but does not possess all the formal characteristics of one. It seems appropriate to infer from Farris that in deciding whether to treat such an arrangement as a merger the Pennsylvania courts would consider the purposes which would be served by imposing liability on Rockwell for the tortious conduct of TMW.[27]

In the present case, Knapp is confronted with the melancholy prospect of being barred from his day in court[28] unless Rockwell is held subject to suit. And quite significantly, if Knapp had been injured more than two years after the dissolution of TMW, Knapp would never have had any opportunity to recover at law, since under Pennsylvania law a dissolved corporation is subject to suit for only two years after the date of dissolution.[29]

Denying Knapp the right to sue Rockwell because of the barren continuation of TMW after the exchange with Rockwell would allow a formality to defeat

---

24. 393 Pa. 427, 143 A.2d 25 (1958).

25. 143 A.2d at 28.

26. *See also*, Troupiansky v. Henry Disston & Sons, 151 F.Supp. 609 (E.D.Pa.1957); Marks v. Autocar Co., 153 F.Supp. 768 (E.D.Pa. 1954); Bloch v. Baldwin Locomotive Works, 75 Pa.D. & C. 24 (C.P.Del.Co. 1950).
In *Glen Alden*, the Court stated in dictum that even if the exchange were a sale, another statutory provision would give dissenting shareholders valuation rights. 143 A.2d at 31.

27. Although the facts of the present case are admittedly a step beyond those in *Farris*, in view of the legislative intent deduced by the Pennsylvania courts in the field of dissenting shareholders' rights, it might be contended that the Pennsylvania Supreme Court would find that the legislature intended to permit tort liability in cases like the one sub judice.

28. Knapp might be able to recover a limited amount by way of a workmen's compensation claim. However, nothing in the record here sheds any light on such possibility.

29. Pa.Stat.Ann. § 2111 (Supp.1974).

Knapp's recovery. Although TMW technically existed as an independent corporation, it had no substance. The parties clearly contemplated that TMW would terminate its existence as a part of the transaction. TMW had, in exchange for Rockwell stock, disposed of all the assets it originally held,[30] exclusive of the cash necessary to consummate the transaction. It could not undertake any active operations. Nor was TMW permitted under the agreement to divest itself of the Rockwell stock, so that it might become an effective investment vehicle for its shareholders.[31] Most significantly, TMW was required by the contract with Rockwell to dissolve "as soon as practicable."

On the other hand, Rockwell acquired all the assets of TMW, exclusive of certain real estate that Rockwell did not want, and assumed practically all of TMW's liabilities. Further, Rockwell required that TMW use its "best efforts," prior to the consummation of the transaction, to preserve TMW's business organization intact for Rockwell, to make available to Rockwell TMW's existing officers and employees, and to maintain TMW's relationship with its customers and suppliers. After the exchange, Rockwell continued TMW's former business operations.

If we are to follow the philosophy of the Pennsylvania courts that questions of an injured party's right to seek recovery are to be resolved by an analysis of public policy considerations rather than by a mere procrustean application of formalities, we must, in considering whether the TMW-Rockwell exchange was a merger, evaluate the public policy implications of that determination.

In resolving, where the burden of a loss should be imposed, the Pennsylvania Supreme Court has considered which of the two parties is better able to spread the loss. In Ayala v. Philadelphia Board of Education,[32] a student who had been injured by a shredding machine during an upholstery class sued the Board of Education. The Court, in abolishing the doctrine of immunity in suits against local government, observed that the Board was in a better position than the student to have avoided the injury, and that "The city is a far better loss-distributing agency than the innocent and injured victim."[33] The Court, quoting the Supreme Court of Illinois, decried the injustice of imposing upon an injured party the entire burden of his injuries, rather than distributing the responsibility throughout the community "where it could be borne without hardship upon any individual."[34]

The Pennsylvania courts have also noted the importance of insurance in performing the loss-spreading function. In Falco v. Pados, the Court concluded that public interest mandated the abolition of parental immunity from liability for a parent's negligent injury to his child because, in the presence of wide-spread liability insurance coverage, the doctrine of parental immunity unjustly confined the burden of the loss to the injured party alone. "In a time of almost universal liability insurance, such unexpected hardship or ruin is needlessly inflicted by the immunity doctrine."[35]

Interpreting all the allegations in the light most favorable to Knapp, as we must on a motion for summary judgment, neither Knapp nor Rockwell was ever in a position to prevent the occur-

---

**30.** The contract with Rockwell provided that "TMW" shall have the right to dispose of, prior to closing, real estate interests held by TMW or its subsidiary. By the terms of the contract, if TMW failed to dispose of these assets prior to closing, they would be transferred to Rockwell.

**31.** It is an indication of the true nature of the transaction that, although Rockwell delivered its stock to TMW, the reorganization agreement required letters of investment intent

from TMW's controlling shareholders, rather than from TMW.

**32.** 453 Pa. 584, 305 A.2d 877 (1973).

**33.** 305 A.2d at 882, *quoting* from 32 Am. Trial L.J. 284, 288 (1968).

**34.** 305 A.2d at 881, *quoting* Molitor v. Kaneland Community Unit Dist. No. 302, 18 Ill.2d 11, 163 N.E.2d 89 (1959).

**35.** 444 Pa. 372, 282 A.2d 351 (1971), at 355.

rence of the injury, inasmuch as neither manufactured the defective device. As between these two parties, however, Rockwell is better able to spread the burden of the loss. Prior to the exchange with Rockwell, TMW had procured insurance that would have indemnified TMW had it been held liable to Knapp for his injuries. Rockwell could have protected itself from sustaining the brunt of the loss by securing from TMW an assignment of TMW's insurance. There is no indication in the record that such an assignment would have placed a burden on either Rockwell or TMW since TMW had already purchased the insurance protection, and the insurance was of no continuing benefit to TMW after its liability to suit was terminated by Pennsylvania statute. Rockwell has adduced no explanation, either in its brief or at oral argument, why it agreed in the contract not to take an assignment of TMW's prepaid insurance. Rockwell therefore should not be permitted to impose the weight of the loss upon a user of an allegedly defective product by delaying the formal dissolution of TMW. In the absence of contrary controlling decisions by the Pennsylvania courts, we conclude that the state judiciary would adopt the rule of law that appears to be better reasoned and more consistent with the social policy set forth in recent Pennsylvania cases.[36]

The judgment of the district court will therefore be reversed and the case remanded for further proceedings consistent with this opinion.

ROSENN, Circuit Judge (concurring).

The majority holds that, under certain circumstances, a corporation which acquires substantially all the assets of another corporation may be held liable for injuries caused by defective products manufactured by the other corporation before the date of acquisition. In the present case, they conclude that, even though the transaction was structured as a sale of assets, it should be "treated as a merger" for the purpose of imposing tort liability. Although I concur in the result reached by the majority, I wish to clarify the basis upon which I would impose such liability.

Our examination should begin with the Pennsylvania Business Corporation Law which provides for merger of two or more corporations. 15 P.S. § 801 et seq. One of the purposes of the statutory merger provisions is to protect dissenting shareholders by according them the right to have their shares redeemed by the corporation at full market value. *See* 15 P.S. § 805. Another purpose is to protect persons having claims against a nonsurviving corporation. *See* 15 P.S. § 803.

Section 803 provides in part that, after merger,

all debts not of record, duties, and liabilities of each of said constituent corporations shall thenceforth attach to the said surviving . . . corporation . . . . .

Thus, had Rockwell's acquisition of TMW been accomplished by merger rather than by purchase of assets, section 803 would have subjected Rockwell to liability for tort claims against TMW.

In the present day of complex corporate reorganizations and acquisitions, the intrinsic nature of a transaction cannot be ascertained merely from the form in which it is structured. Courts therefore must examine the substance of the transaction to ascertain its purpose and true intent.

[I]t is no longer helpful to consider an individual transaction in the abstract and solely by reference to the various elements therein determine whether it is a "merger" or a "sale". Instead, to determine properly the nature of a corporate transaction, we must refer not only to all the provisions of the

---

**36.** Our disposition of this issue makes it unnecessary for us to decide whether there remained a material issue of fact as to whether Rockwell had expressly assumed TMW's potential liability to Knapp. In particular, we need not decide whether the affidavit of the Assistant General Counsel of Rockwell, submitted for the first time after the appeal was filed, was properly before this Court.

agreement, but also to the consequences of the transaction and to the purposes of the provisions of the corporation law said to be applicable.

Farris v. Glen Alden Corp., 393 Pa. 427, 432, 143 A.2d 25, 28 (1958).

The Pennsylvania Supreme Court has had occasion to examine the rights of dissenting shareholders when a transfer of the business operations of one corporation to another is effectuated by sale rather than by utilization of the statutory procedures provided for merger. In Farris v. Glen Alden Corp., *supra,* Glen Alden entered into an agreement to purchase all of the assets of List Industries Corporation (List) in exchange for capital stock of Glen Alden. List was to be dissolved and the operations of both corporations were to be carried on by Glen Alden, whose name was to be changed to List Alden. The directors of both corporations were to become directors of List Alden. In enforcing the appraisal rights of an objecting stockholder of Glen Alden, the court stated that, even though the combination of corporations was effectuated by a sale of assets to which the merger statute does not literally apply, "we will not blind our eyes to the realities of the transaction." 393 Pa. at 438, 143 A.2d at 31. It concluded that the combination proposed, "although consummated by contract rather than in accordance with the statutory procedure, is a merger within the protective purview . . . of the corporation law." *Id.* It reached this conclusion on the following basis:

> The rationale . . . of the present section of the Business Corporation Law . . . is that when a corporation combines with another so as to lose its essential nature and alter the original fundamental relationships of the shareholders among themselves and to the corporation, a shareholder who does not wish to continue his membership therein may treat his membership in the original corporation as terminated and have the value of his shares paid to him.

Farris v. Glen Alden Corp., *supra,* 393 Pa. at 433, 143 A.2d at 29. Thus, whether or not the formal merger procedures are followed, the appraisal rights embodied in section 805 should be enforced if a transaction alters the "fundamental relationships" among a corporation and its investors. This altering of "fundamental relationships" is the attribute of merger which triggers the applicability of section 805 appraisal rights.

If, in protecting dissenting shareholders, a court should scrutinize a corporate transaction to ascertain the presence of certain attributes of merger relevant to the enforcement of appraisal rights, it should do no less in protecting tort claimants. Both dissenting shareholders under section 805 and tort claimants under section 803 are the intended beneficiaries of protective legislation. Although a transaction should be scrutinized to protect both shareholders and tort claimants, a court should search for somewhat different attributes of merger for purposes of imposing tort liability. This difference in relevant attributes stems from the distinct relationships to the corporation of the persons whom the legislature has sought to protect. While dissenting shareholders need protection against alteration of their investment rights, tort claimants need protection against attempts by ongoing businesses to avoid liability through transfer of their operations to another legal entity.

I believe that, where a corporation purchases substantially all the assets of a second corporation, the legislature intended to impose the second corporation's tort liabilities on the acquiring corporation at least if the following attributes of merger are present:

(1) an ongoing business, including its name and good will, is transferred to the acquiring corporation; and

(2) the corporation whose assets are acquired is dissolved after distribution to its shareholders of the consideration received from the acquiring corporation.

In the present case, TMW transferred to Rockwell almost all its assets, retain-

ing only its corporate records and a limited amount of cash to effectuate the transaction.[1] The "Agreement and Plan of Reorganization" specifically provided for the transfer of TMW's business "as a going concern," including good will, the exclusive right to use the name "Textile Machine Works," and the "permits or licenses to conduct [TMW's] business as now carried on." TMW also agreed to change its name and dissolve. In this regard, the "Agreement and Plan of Reorganization" provided that,

> [o]n the Closing Date, TMW shall take all action required to change its name to "T.W. Company" ("TW") . . . .
> As soon as practicable after the last [liquidating distributions to its shareholders of Rockwell stock], TW shall wind up its affairs and dissolve. From and after the Closing Date, TW shall not engage in any business or other activity except as required to carry out the terms of this Agreement and to complete its liquidation and dissolution as provided herein.

In addition, this transaction has another characteristic of a statutory merger. The consideration given for TMW's assets was Rockwell stock, which in turn was to be distributed to TMW's shareholders on TMW's liquidation and dissolution. Thus, TMW shareholders became shareholders in Rockwell just as if they had exchanged their shares directly with Rockwell under the statutory merger procedure. See 15 P.S. § 801.

On the basis of the foregoing, I am persuaded that the Pennsylvania courts would consider this transaction a merger within the intendment of section 803. This I believe they would do even though the transaction was structured as a sale and even though TMW had not fully wound up its affairs and dissolved until 18 months after the combination. TMW actually had ceased to function as a going concern when the sale was consummated. Only a corporate shell remained, engaged solely in the process of winding up and dissolution.

While I recognize the rightful prerogative of a corporation to rearrange its business or go out of business entirely, there is also a practical and reasonable basis for construing this transaction as a merger. Were we in the circumstances of this case to absolve of liability a corporation which acquires a functioning business by purchasing substantially all the assets of another corporation, many injured parties would be unable to maintain products liability actions[2] after the

1. The "Agreement and Plan of Reorganization" provided that,
   TMW shall convey, transfer, assign and deliver to [Rockwell] . . . all the property and assets, tangible and intangible, of every kind, nature and description and wherever situated, owned, possessed or held by TMW on the Closing Date (hereinafter referred to in Paragraph 5) including, but not limited to, TMW's land and leaseholds as described in Exhibit A–1 attached hereto, improvements, buildings, machinery, equipment and other fixed assets, real and personal, and rights appurtenant thereto, furniture, fixtures, business machines, vehicles, inventories, supplies, work in process, semi-finished products, patents, trademarks, licenses, trade names, copyrights, securities, investments, leasehold interests, options to purchase real or personal property, rights under contracts, insurance policies, cash on hand and in banks, accounts and notes receivable, claims, rights, choses in action, permits or licenses to conduct its business as now carried on, business as a going concern, shares of stock in other corporations, good will and all rights to use to the exclusion of TMW the name "Textile Machine Works" or a name or names similar thereto, except, however, the following, which shall be retained by TMW:
      (a) TMW's corporate seal, articles of incorporation, minute books, stock books and other corporate records; and
      (b) $500,000 in cash to cover the costs and expenses of TMW (in such amounts as shall be agreed upon in writing by NR and TMW at or before the Closing) in connection with the transactions constituting the Plan of Reorganization under this Agreement, any payments to TMW preferred shareholders who demand cash for their shares, and all taxes on the transfer of any of the assets or properties to NR hereunder. Any balance of such sum remaining upon the dissolution of TMW shall be paid to NR at such time.

2. In 1970 the President's Commission on Product Safety [reported that] [s]ome 20

former corporate owner of the business has been dissolved. Although by statute Pennsylvania corporations are amenable to suit for two years after dissolution, a defect in a product manufactured by a dissolved corporation may not come to light until long after the two-year period. *See* 15 P.S. § 2111. Because the statute of limitations generally does not begin to run until the defect is discovered, such an action probably would not be time-barred.

In imposing liability for the torts of the acquired corporation, I realize that the acquiring corporation was not a party to any tortious act and had no connection with the acquired corporation at the time the allegedly defective product was manufactured. The acquiring corporation, however, is in a position both before and after the acquisition to take necessary measures for its protection against potential products liability claims.

I do not express, nor does the majority, any opinion concerning the merits of the tort claim which we today permit plaintiff to bring against Rockwell.

I would reverse the judgment of the district court and remand for further proceedings.

million Americans are injured each year as a result of incidents connected with consumer products. [Final Report of the National Commission on Product Safety (June, 1970), Lib.Cong. No. 76–600753.] Incidents connected with industrial products account for an additional 7 million injuries each year. [The President's Report on Occupational Safety and Health (May, 1972).] Personal injuries are the primary source of the burgeoning number of product liability cases entering our courts.

Weinstein, Twerski, Piehler, & Donaher, Product Liability: An Interaction of Law and Technology, 12 Duquesne L.Rev. 425 (1974).