LONG JOHN SILVER'S, INC., and Jerrico, Inc., Plaintiffs,

v.

ARCHITECTURAL ENGINEERING PRODUCTS CO., INC., ta/dba Perma-Shake, Berridge Manufacturing Co., Defendants.

KORAD, INC., and Atlanta Venetian Blind, Inc., ta/dba Permaclad, Defendants and Third-Party Plaintiffs,

v.

ROHM AND HAAS COMPANY, Plasteel, Inc., and Enamel Products Company, Third-Party Defendants.

Civ. A. No. 79–325.

United States District Court,
W. D. Pennsylvania.

Aug. 5, 1981.
Order Aug. 6, 1981.

Diane W. Perer, Pittsburgh, Pa., for plaintiffs.

J. W. Montgomery, III, W. Arch Irvin, Jr., Richard D. Klaber, Thomas J. Reinstadtler, David Trushel, Richard H. Martin, Joan P. Feldman, Pittsburgh, Pa., Roger B. Greenberg, Houston, Tex., Thomas A. Lazaroff, Pittsburgh, Pa., for defendants.

OPINION

DIAMOND, District Judge.

Long John Silver's Seafood Shoppes is a chain of restaurants operated and franchised by plaintiff Long John Silver's, Inc.

(LJS), a wholly owned subsidiary of plaintiff, Jerrico, Inc. Plaintiffs brought this action to recover damages for the alleged deterioration of roofs at certain LJS Seafood Shoppes and named as defendants Korad, Inc., the supplier of a patented acrylic film (Korad film) used to coat the roofs, and three suppliers of the finished roofs, Architectural Engineering Products Co., Inc., ta/dba Perma-Shake (Perma-Shake), Atlanta Venetian Blind, Inc., ta/dba Permaclad (Permaclad), and Berridge Manufacturing Co. Defendant Korad joined as a third-party defendant the Rhom and Haas Company (RH), the company from whom it had purchased the patented Korad film process. And Permaclad then joined as third-party defendants RH and two companies which allegedly supplied the Korad-coated metal coils from which the roofs were constructed, Plasteel, Inc., and Enamel Products Company.

There are two motions presently before the court, a motion to dismiss filed by the defendant Berridge on the ground that this court lacks subject matter jurisdiction because certain assignments of claims were collusive for the purpose of "manufacturing" jurisdiction within the meaning of 28 U.S.C. § 1359 and a motion for partial summary judgment filed by Korad on the theory that under the principles of successor liability it cannot be held accountable for any products sold during the time that its predecessor RH owned and sold the Korad film. For the reasons set forth below, we will deny the motion to dismiss and grant substantially all of the motion for partial summary judgment.

## I. THE MOTION TO DISMISS

The following facts submitted by plaintiffs in an affidavit are undisputed:

1. LJS operates and franchises over 1,000 Long John Silver's Seafood Shoppes throughout the United States. A LJS franchisee operates its Long John Silver's Seafood Shoppe(s) pursuant to a written franchise agreement (the "Agreement") executed by the franchisee and LJS ....

2. Pursuant to the Agreement, LJS: (a) trains certain of the employees of the franchisee; (b) periodically consults with the franchisee relative to the franchised operation; (c) originates, determines and controls all advertising; (d) *approves all building plans and specifications and inspects the premises of the franchisee to determine the quality of operation and compliance with the Agreement (emphasis added)*; and (e) may at its option terminate the Agreement if the franchisee is deemed in default.

3. Pursuant to the Agreement, LJS franchisees are required, *inter alia*, to: (a) build LJS shoppes in strict compliance with LJS specifications; (b) conform to LJS operating standards and procedures; and (c) renovate and refurbish the shoppes to conform to LJS's then current public image.

4. Subsequent to 1973, LJS specified KORAD-coated blue roofs for use on LJS franchisee and company shoppes. LJS is the owner of Federal Service Mark Registration No. 959,078 covering shoppe structure and its distinctive appearance. Affidavits under 15 U.S.C. 1058(a) and 1065 have been filed in connection with the service mark registration and the service mark registration is now outstanding, validly subsisting and uncancelled, and is incontestable under 15 U.S.C. section 1065. LJS adopted the distinctive building design, including the blue roofs which form a major feature thereof, as a company symbol. The shoppe design is used extensively in LJS' advertising campaign as an identifying characteristic to promote its public image.

5. Defendant Berridge Manufacturing, Co. ("Berridge") on its own initiative, approached LJS concerning the use of Berridge's KORAD-coated roof systems on both franchisee and company operated LJS shoppes. LJS, on its own behalf and on behalf of its franchisees, negotiated the terms and conditions of these sales with Berridge, including the express and oral written representations and warranties. On the basis of Berridge's representations and warranties, LJS agreed to

name Berridge as an approved supplier. Subsequent to 1975, Berridge was specified in LJS Building specifications as one of three approved suppliers of KORAD-coated roofs.

Plaintiffs allege that beginning in 1977 a substantial number of the roofs sold by Berridge and the other two suppliers, Perma-Shake and Permaclad, began to deteriorate and exhibit defects such as fading, chipping, peeling, rusting, and flaking of the Korad coating. The uncontested portion of plaintiffs' affidavit continues.

6. When the KORAD roof failures began to appear, the franchisees looked to LJS to assist them in notifying the suppliers, including Berridge, of the defective roofs. As the number of failures grew, LJS on behalf of itself and its franchisees negotiated with the suppliers, including Berridge, to resolve the matter.

7. By December 1978, having received no satisfactory response to its demands, LJS made a determination to institute this action on its behalf and on behalf of those franchisees who executed an assignment and release. The assignment and release provided, *inter alia*, that: (a) the franchisee releases and discharges LJS from any claims it may have against it in connection with KORAD roofs; (b) the franchisee assigns its entire claim against Berridge to LJS; (c) LJS bears all legal expenses and controls the litigation; and (d) the franchisee must cooperate fully with LJS.

As Berridge points out, the assignment also contained language to the effect that the franchisee "may share in the recovery, if any, which pertains to the shoppes."

Plaintiffs either own each of the buildings in the instant suit where roof damage is alleged to have occurred or as a result of the aforesaid assignments are the assignees of the claim arising out of that damage. It is these assignments which Berridge contends were collusive.

Although the matter of jurisdiction was placed in issue by Berridge, it is of course the rule that the party invoking diversity jurisdiction has the burden of establishing it. *McSparran v. Weist*, 402 F.2d 867, 875 (3rd Cir. 1968).

Section 1359 of 28 U.S.C. provides:

"A district court shall not have jurisdiction of a civil action in which any party, by assignment or otherwise, has been improperly or collusively made or joined to invoke the jurisdiction of such court."

Early cases construing § 1359 held that so long as an assignment of a claim or appointment of a non-resident representative was valid under applicable state law and not a mere sham there was no violation of § 1359. *See* cases at 3A Moore's Federal Practice ¶ 17.05[3.–1] n.7, (2d ed. 1979), and 75 ALR2d 717 § 3(a). In *Corabi v. Auto Racing, Inc.*, 264 F.2d 784 (3rd Cir. 1959), the Third Circuit marked the outer limits of that view and provided "the authoritative foundation for the maintenance of 'manufactured' diversity jurisdiction," *McSparran, supra*, 402 F.2d at 872. In *Corabi* the court held that even the appointment of a non-resident administrator for the sole purpose of creating diversity jurisdiction was not "collusive" within § 1359 so long as the appointment itself was true and valid, the court noting that the term "collusion" in its ordinary usage required something akin to a fraudulent or improper agreement made by opposing litigants and did not pertain to a tactical decision made by one party acting in its own best interests.

Subsequent to *Corabi*, the Supreme Court in *Kramer v. Carribean Mills, Inc.*, 394 U.S. 823, 89 S.Ct. 1487, 23 L.Ed.2d 9 (1969) addressed § 1359 and the problem which it was designed to cure. In that case a Panamaian corporation assigned its claim under a contract it had with a Haitian company to a Texas attorney, one Kelley, for the nominal fee of one dollar. In a separate instrument Kelley then promised to return ninety-five percent of any recovery to the assignor who apparently was to assume all legal expenses. The Supreme Court concluded that since the assignee had no previous connection with the dispute, was going to remit ninety-five percent of any recovery, and stood to lose nothing if the suit failed, he constituted nothing more than a

collection agent and the assignment, therefore, was "collusive." To hold otherwise, the Court said, would be to invite the very type of "manufactured jurisdiction" that § 1359 was designed to prevent. The fact that the assignment was valid under state law was of little consequence, since the real issue was one of jurisdiction, clearly a matter controlled by federal rather than state law.

Under *Kramer*, therefore, it is not enough that the assignment be valid under state law, it must also be real, as opposed to merely colorable, in the sense that the assignee had a substantial pre-existing interest in the dispute. *See Carribean Mills, Inc. v. Kramer*, 392 F.2d 387 (5th Cir. 1968); *McSparran, supra*, 402 F.2d at 873. In the words of Professor Moore, it is significant to ascertain whether the assignee "had some independent, legitimate interest in the dispute that predated the assignment and was not a complete stranger to the transaction." 3A Moore's, *supra*, ¶ 17.05[3.–1] at 17–47.

*Kramer* left open the question, at least where the transfer of the claim is true and absolute, as to the relevance of the motive for the assignment; i. e., how much weight is to be attached to the fact that the purpose of the assignment was to invoke diversity jurisdiction. While some courts have held that motive is irrelevant, *See* cases at 6 Wright & Miller, Federal Practice and Procedure: Civil § 1557 (1971), the law in this circuit is to the contrary. *Corabi* was expressly overruled in that regard by *McSparran*, where the court held that while a motive to create diversity is not in and of itself improper, neither can it be ignored altogether in evaluating the circumstances of a particular case. Thus, in examining any § 1359 claim of collusion in this jurisdiction, motive must be considered together with a determination as to whether the assignment was real or colorable and whether there is the presence or absence of some independent, pre-existing legitimate interest in the assignee.

■ Defendant Berridge argues principally that the assignment here must be deemed collusive because the assignors, the individual shoppe owners and franchisees, retained an interest in the claims, since, as noted above, the assignment stated that the franchisees "may share in the recovery, if any." However, we do not deem that factor to be sufficient to sustain a finding of manufactured jurisdiction.

Initially, it is not clear that any of the assignors will in fact retain an interest in their assigned claims, since the assignment instrument uses the term "may" rather than "shall". But even assuming that we conclude that an interest of some indefinable nature is retained, that does not end our inquiry for, as noted in *Ferrara v. Philadelphia Laboratories, Inc.*, 272 F.Supp. 1000 (D.Vt.1967), the primary authority upon which Berridge relies, retention of a substantial interest in the litigation, while perhaps the most important factor to be examined, is not alone determinative. Inquiry must be had into all the circumstances surrounding the transfer.

The other factors which we believe to be significant are, first, that this litigation in its entirety is being paid for and directed by LJS. *See Id.* at 1012. Obviously, therefore, LJS is to be distinguished from other assignees who, in view of the assignor's retention of the beneficial interest in the claim, have been characterized as mere collection agents, *Kramer, supra*, 394 U.S. at 827–28, 89 S.Ct. at 1489–90. Collection agents in this context do not assume legal fees and costs and direct litigation.

Secondly, and most importantly it is clear that LJS had a legitimate independent business interest in this dispute which predated the execution of the assignments. As noted previously, LJS required their franchisees to install Korad-coated roofs and therefore has an interest, and quite possibly a legal obligation, to rectify the problem which has arisen with regard to them. Moreover, it has a legitimate interest to maintain not only good relations with its franchisees, but also its public image and goodwill. It is the owner of a registered service mark covering the distinctive building design and appearance of its shoppes, including roof structure

and appearance, and, therefore, has a valid business reason to protect the appearance of its franchised shoppes in order to avoid an adverse reflection on the entire LJS chain.

In addition to the maintenance of goodwill, the superior knowledge of LJS in this controversy is an additional basis for its claim of legitimate independent interest. Much of this suit involves breach of warranty claims regarding the performance of Korad acrylic film. These warranties, both written and oral, allegedly were made directly to plaintiffs during the period that the three suppliers approached LJS and solicited its use of Korad-coated roofs. Obviously, LJS is in the best position to litigate the claims based upon a "sales pitch" allegedly made directly to it. This observation is confirmed by the fact that when the roofs began to fail the franchisees looked to LJS for assistance, and it was LJS which conducted settlement negotiations with Berridge and the two other roof suppliers. Therefore, we conclude that the assignee had an independent interest in this dispute at least equal, and probably greater than, that deemed sufficient in other cases, See *Prudential Oil Corp. v. Phillips Petroleum*, 546 F.2d 469 (2nd Cir. 1976); *Henley and Co. v. Miller Golf Equipment Corp.*, 300 F.Supp. 872 (D.P.R.1969); *National Surety Corp. v. Inland Properties, Inc.*, 286 F.Supp. 173 (E.D.Ark.W.D.1968). And in our judgment, that interest outweighs any suggestion of collusion based on the fact that the assignors may share in the recovery.

Berridge also urges that the assignments may have been motivated by the improper desire to preserve diversity of citizenship among the parties. It argues that even if we assume, as plaintiffs contend, that just those cases alone which arose out of LJS-owned shoppes satisfied the $10,000.00 jurisdictional requirement, nevertheless LJS needed the assignments because without them the quite natural joinder of remaining franchisees as co-plaintiffs would have destroyed diversity. However, the question of motive, as noted in *McSparran*, is just one of the factors to be considered in determining whether or not there was collusion, and

we conclude that the undeniable legitimate independent interest which LJS has in this dispute is sufficient to overcome any suggestion that collusion may be inferred from the circumstances cited by Berridge in its speculative argument based on possible motive. The motion to dismiss under § 1359 will be denied.

## II.  THE MOTION FOR PARTIAL SUMMARY JUDGMENT

Korad moved for partial summary judgment on all claims arising out of roofs constructed before March 24, 1976, on the ground that it was not until after that date that it acquired the rights to the Korad process from third-party defendant RH. This motion raises the issue of successor liability, i. e., under what circumstances may a successor in interest (Korad) be liable for the wrongs committed by its predecessor (RH). We find the following facts from the movant's uncontested affidavit, admissions by respondent in its brief, and recitations in the Korad-RH sales agreement tendered by the respondent. Prior to January 1, 1976, Korad-brand acrylic film was exclusively manufactured and sold under that name by RH. On that date, the Korad film business, including machinery, equipment, inventory, trademarks, formulae, patents, marketing records, customer lists, was sold by RH to a company which had been formed to conduct the sale of the Korad acrylic film and which had in fact adopted its name, Korad, Inc. Pertinent terms of the sales agreement included the fact that the Korad film would be manufactured by Korad from acrylic polymer furnished exclusively by RH (agreement ¶ 14), and RH would receive a three percent royalty payment on all Korad sales until the end of 1987 (agreement ¶ 3b).

The parties agree that the question of successor liability in this circuit is controlled by *Knapp v. North American Rockwell Corp.*, 506 F.2d 361 (3rd Cir. 1974). In that diversity case in which Pennsylvania law applied, the plaintiff was injured by a machine manufactured by Textile Machine

Works (TMW), a company which one year prior to the accident had sold all of its interest in the machine as well as the name TMW to the defendant Rockwell. Substantially all of the assets of TMW were exchanged for Rockwell stock. Under the terms of the sales agreement, TMW was to distribute the Rockwell stock to its shareholders and then to dissolve as soon as practicable.

In resolving the question of Rockwell's liability for injuries caused by a machine sold by its predecessor, the Third Circuit reasoned:

> The general rule is that "a mere sale of corporate property by one company to another does not make the purchaser liable for the liabilities of the seller not assumed by it." . . . There are, however, certain exceptions to this rule. Liability for obligations of a selling corporation may be imposed on the purchasing corporation when (1) the purchaser expressly or impliedly agrees to assume such obligations; (2) the transaction amounts to a consolidation or merger of the selling corporation with or into the purchasing corporation; (3) the purchasing corporation is merely a continuation of the selling corporation; or (4) the transaction is entered into fraudulently to escape liability for such obligations.
> Shane v. Hobam, Inc., 332 F.Supp. 526, 527–528 (E.D.Pa.1971) (citations omitted) (decided under New York Law)."[1]  Id. 506 F.2d at 363–4.

The court recognized that under strict corporate law principles the transaction between Rockwell and TMW was not a consolidation, merger, or continuation, since to qualify as any of those TMW would have had to cease to exist at the time of the sale, and it was undisputed that TMW's dissolution took eighteen months to complete.

Nevertheless, the court concluded that in light of Farris v. Glen Alden Corp., 393 Pa. 427, 143 A.2d 25 (1958)[2] the Pennsylvania courts would be guided by "public policy considerations rather than by a mere procrustean application of [corporate] formalities." Knapp, supra, 506 F.2d at 369. In applying public policy considerations, the court found a defacto merger to exist because a) while technically continuing to exist after the sale of its assets, TMW's existence lacked real substance since its sole business was to cease doing business as soon as practicable, whereas Rockwell had essentially continued the TMW business; and b) Rockwell was in a better position to absorb the loss since it could have sought assignment of TMW's insurance policy providing coverage for injuries of this sort.

Our case is similar to Knapp in that technically there was no merger, consolidation, or continuation here. However, plaintiffs go further and say, in effect, that it is on all fours with Knapp because Korad, like Rockwell, has continued its predecessor's business substantially without change in name or manufacturing or marketing practices. Assuming that to be the case, and even accepting plaintiffs' assertion that RH has a continuing financial interest in Korad as a result of the sale of raw materials and royalty rights by RH to Korad, there nevertheless remains a critical distinction between this case and Knapp. The predecessor here, RH, appears to have continued as a substantial on-going business entity unlike TMW in the Knapp case, which became a mere shell. RH has filed an appearance in this suit and is actively defending the claim. Berridge admits, in fact stresses, that RH continues to supply materials to Korad, to receive royalty payments from their acrylic film sales, and to consult with Korad on product failure cases. Moreover,

---

1. In this context the term "continuation" refers to the situation where a new corporation is formed for the purpose of continuing the business of an extant corporation which then ceases to exist.

2. Farris held that a sale of assets between two concerns, though not in conformity with the statutory merger procedure, nevertheless provided those opposed to the sale with dissenting shareholder rights since the purpose of the dissenting rights applied with equal force to a transaction which fundamentally altered the relationship between minority holders and their company, though not technically amounting to a merger.

the agreement of sale refers to RH as a general manufacturer of chemicals, plastics, and related materials desirous of selling one aspect of its business, namely, its acrylic film business. In contrast to the predecessor in *Knapp* which remained anything but a going business concern following its sale, here, plaintiffs have an apparently solvent existing party from whom to seek satisfaction, and are not in the position of the plaintiff in *Knapp* who was faced with "the melancholy prospect of being barred from his day in court unless Rockwell [was] held subject to suit." *Knapp, supra*, 506 F.2d at 368.

Under the circumstances in Rockwell, we can appreciate the significance of its having substantially continued its predecessor's business. But here we think that the degree of continuation or financial inter-dependence thus far evident in the Korad-RH relationship, or that which might be developed with further discovery, is immaterial in view of the fact that the entity which sold the product, and therefore the one which should be burdened with the primary responsibility for defects therein, is an on-going business apparently capable of satisfying the claim. In short, policy considerations suggest to us that as between two on-going businesses of the type involved here, who as far as the record is concerned are equally capable of responding to a claim, the risk of loss should fall on the party who marketed the product. And we believe that this is precisely how the risk would have been apportioned in *Knapp* had TMW been a viable defendant. Therefore, the motion for partial summary judgment will be granted as to claims arising out of roofs the construction of which was completed prior to March 24, 1976, the date Korad first sold Korad film.

Korad also seeks partial summary judgment as 1) those roofs the construction completion date of which cannot be specified at this time by plaintiffs; and 2) those roofs which have not evidenced damage and for which plaintiffs seek declaratory judgment in their prayer for relief. The first of these motions will be denied, for, as plaintiffs point out, they have not yet had the benefit of complete discovery. At time of trial they will, of course, have to adduce proof that all roofs for which they seek recovery from Korad were completed after March 24, 1976.

The second motion, however, will be granted in essence. We have reviewed the declaratory judgment statute and the cases pertinent thereto, and conclude that this case is simply not appropriate for that device. Obviously there will be disputed issues of fact surrounding each and every roof failure. Hence, it is questionable whether any benefit will be derived by the use of a declaratory judgment action. To the extent that facts are determined in these proceedings which will be relevant to later cases, if any, between the same parties, the doctrine of collateral estoppel will be available. Moreover, plaintiffs can seek to amend their complaint as other damaged roofs are discovered. For these reasons, that aspect of plaintiffs' prayer for relief seeking declaratory judgment on all roofs which similarly deteriorate in the future will be stricken.

An appropriate order will be entered.

### ORDER OF COURT

AND NOW, this 6th day of August, 1981, for the reasons set forth in an opinion filed by the court in the within matter on August 5, 1981, IT IS ORDERED that the motion to dismiss filed by the defendant Berridge Manufacturing Co. be, and the same hereby is, denied; and

IT IS FURTHER ORDERED that the motion for partial summary judgment filed by defendant and third-party plaintiff Korad, Inc. be, and the same hereby is, granted in part and denied in part, as specifically set forth in the aforesaid opinion.